## In re NATIONAL REAL ESTATE LIMITED PARTNERSHIP II, a Wisconsin limited partnership, Debtor.

### Bankruptcy No. 87–05232.

United States Bankruptcy Court,
E.D. Wisconsin.

June 16, 1988.

Frisch, Dudek & Slattery, Ltd., Patrick B. Howell, Milwaukee, Wis., for debtor.

Jeffrey P. Aiken, Milwaukee, Wis., for John Vishnevsky, an individual general partner of debtor.

Michael, Best & Friedrich, Paül S. Medved, Mark G. Styles, Milwaukee, Wis., for Consolidated Capital Properties.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

## NATURE OF PROCEEDING

This is a core proceeding under 28 U.S.C. § 157(b)(2)(G). It arises in the context of a motion for relief from the automatic stay by Consolidated Capital Properties ("ConCap"), a California limited partnership, with its prime focus upon § 362(d)(2) of the Bankruptcy Code. § 362(d)(1) has been asserted as an alternative ground for relief from stay.

An evidentiary hearing was held on May 2, May 13 and May 16, 1988. Briefs and oral argument have been ably presented to the court by participating counsel.

## FACTS

National Real Estate Limited Partnership II ("debtor") is a limited partnership organized in Wisconsin on December 24, 1980. It was created to engage in the business of investing in, operating, leasing and improving interests in real estate. The debtor's sole asset is a 228 unit apartment complex known as the Round Tree Apartments, located on a 14–acre site in San Antonio, Texas. The limited partnership has 691 limited partners and two general partners consisting of John Vishnevsky and NRELP–II General Partner, Inc., a Wisconsin corporation whose stock is wholly owned by Mr. Vishnevsky.

The Round Tree Apartments was built in 1970. It was purchased by the debtor from ConCap on September 15, 1981 for $6,100,-

000 [1] and financed by a $5,400,000 promissory note bearing interest at the rate of 12% per year secured by a Deed of Trust.[2] The note became fully due on May 1, 1987.

The Round Tree Apartments is comprised of 1–bedroom, 2–bedroom and 3–bedroom units with rents ranging from $215 per month to $400 per month. The leases vary from month-to-month up to one year with 6–month leases being the most common form. The occupancy rate is currently 88–90%. The property is in need of considerable maintenance, including painting, major roof repairs and general upkeep, at a total estimated cost of approximately $150,000.

The background for these proceedings is very familiar to bankruptcy courts in Texas, a state particularly hard hit by a drastic economic decline in the oil industry. *See, In re Playa Development Corp.*, 68 B.R. 549 (Bankr.W.D.Tex.1986); *In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108 (Bankr.W.D.Tex.1987). This depressed economy has resulted in high unemployment, declining construction and an escalating number of real estate foreclosures in Texas.[3]

The debtor defaulted on the ConCap note when it became due on May 1, 1987, owing $3,300,000 on principal and $34,100 on accrued interest. ConCap thereafter commenced foreclosure proceedings in Texas. Unlike Wisconsin, under Texas foreclosure law, there are no court proceedings and no equity of redemption. Instead, the grantee of the Deed of Trust provides a notice to cure default to the grantor (in this case, 30 days), and upon failure by grantor to cure said default, the grantee can, after a further 21–day notice, conduct a public sale. Frequently, it is the grantee who is the successful bidder.

On or about November 21, 1987, in an attempt to avoid the public sale and enable the parties to continue negotiations, the debtor paid $17,500 to ConCap. In exchange, ConCap delayed the public sale to December 1, 1987. Negotiations broke down, and on November 30, 1987—one day before the scheduled public sale—the debtor filed its chapter 11 petition in the Eastern District of Wisconsin. ConCap filed its motion for relief from automatic stay on March 17, 1988. On March 29, 1988, the debtor filed a plan of reorganization and disclosure statement.

Under its plan, the debtor has proposed a maturity date of June 30, 1998 on the outstanding principal and an interest rate which is significantly below the 12% interest rate provided in the promissory note between the parties.[4]

The debtor candidly anticipates that ConCap will vote against its plan. It is pinning its hopes upon the use of § 1129(b)—the cram down provision of the Bankruptcy Code. Although the plan is not specifically before the court at this time, it is inextricably linked with ConCap's motion for relief from stay and must therefore be presently scrutinized.

As of November 30, 1987 (when the chapter 11 petition was filed), the balance due to ConCap (including principal, interest and attorneys' fees and expenses) was $3,739,358.99. The promissory note obligates the debtor to pay ConCap's reasonable attorneys' fees and costs. The debtor, however, is not presently conceding that the attorneys' fees and costs being claimed, totalling approximately $75,000, are reasonable. Other outstanding obligations include approximately $75,000 in unpaid 1987 real estate taxes and approximately $4,000 in mechanics' and materialmen's liens. After making some allowance for a possible re-

---

**1.** The purchase price was $5,900,000. Added to this was $200,000 for management fees, attorneys' fees, prepaid insurance premiums and payment under a noncompetition provision, resulting in a combined total price of $6,100,000.

**2.** A Deed of Trust is comparable to a mortgage under Wisconsin law.

**3.** Approximately 40 large apartment complexes were foreclosed upon in the San Antonio area in 1986 and 1987.

**4.** Under its plan, the debtor proposes to pay ConCap interest as follows: 5% for year 1, 5.25% for year 2, 5.5% for year 3, 6% for year 4, 6.5% for year 5, 7.75% for year 6, 8.25% for year 7, 8.75% for year 8, 9% for year 9, and 9.5% for year 10.

duction in the claimed attorneys' fees and costs (solely for purposes of this motion), the court finds that as of November 30, 1987 the total of all outstanding liens and encumbrances against the property is not less than $3,750,000.

### RELIEF UNDER § 362(d)(2)

11 U.S.C. § 362(d)(2) states:

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

    (2) with respect to a stay of an act against property under subsection (a) of this section, if—

        (A) the debtor does not have an equity in such property; and

        (B) such property is not necessary to an effective reorganization."

Under this section, the following two elements must be established:

1. The debtor has no equity in the property.
2. The property is not necessary to an effective reorganization.

The burden of proving that the debtor has no equity in the property is upon ConCap. The debtor must prove that the property is necessary to an effective reorganization. Each element shall hereafter be analyzed in the context of the particular facts involved.

### DOES THE DEBTOR HAVE AN EQUITY IN THE PROPERTY?

The record has clearly established that the debtor lacks equity in the Round Tree Apartments. The total of all of the outstanding liens and encumbrances has been found to be not less than $3,750,000. What must be measured against this amount is the present market value of the Round Tree Apartments.

Love & Dugger, a real estate appraisal firm located in San Antonio, Texas, made the only current appraisal on the property.

Albert Scruggs Love Jr., a highly qualified and respected appraiser and a partner of this firm, presented testimony in support of the appraisal. The appraisal concluded that the market value for the Round Tree Apartments is $3,500,000. The market value was obtained by use of the following three valuation techniques which produced the following values:

| | |
|---|---|
| Replacement cost | $3,250,000 |
| Income | $3,500,000 |
| Market data | $3,365,000 |

Harold Coon Jr., another real estate appraiser from San Antonio, testified for the debtor. He stated that he was retained solely to analyze any discrepancies in the Love & Dugger appraisal, but not to conduct an independent appraisal of the property. He did not dispute the final conclusion reached in the appraisal. However, he did state that recently the San Antonio market has shown some slight improvement. As a result, he estimated that the value of the property may have increased "5% to 10%" since the Love & Dugger appraisal was made. Mr. Love testified that the value of the Round Tree Apartments remains "somewhere between $3.4 million and $3.6 million in today's market." Mr. Coon did dispute certain basic factors which were utilized by Love & Dugger in arriving at the market value under the replacement cost analysis. He stated that he would have used a 40–year economic life, rather than a 30–year economic life and also an apartment unit cost of $24.97/sq. ft. rather than $19.00/sq. ft. Because both appraisers agreed that replacement cost was the least reliable approach, these attempts to undermine the Love & Dugger appraisal were inconsequential.

The only other appraisal presented was that of John M. Hamilton. That appraisal was completed for ConCap in September, 1985 and produced a market value of $6,200,000. Because that appraisal is well over 2½ years old and was prepared when economic conditions were drastically different, it has little or no bearing upon this proceeding.

Little credence was also placed upon the existing real estate tax assessed value of $5,000,000. The debtor, in accordance with its past practice, has recently applied for a reduction in the assessed value. In 1986, the assessed value was reduced from $6,300,000 to $5,800,000, and in 1987, was further reduced to $5,000,000. Love & Dugger concludes that the existing $5,000,000 assessed value is excessive and should be further reduced to $3,500,000.

The debtor has urged this court to recognize the existence of what it calls "real value," and which it claims exceeds the market value arrived at by Love & Dugger. According to the debtor, there is an "inherent value" which must be considered as part of "real value" due to the inactive real estate market in San Antonio. A similar argument was advanced in *In re Conquest Offshore Int'l., Inc.,* 73 B.R. 171 (Bankr.S.D.Miss.1986). In *Conquest,* the court, rejecting that argument, concluded that, notwithstanding the lack of a normal market, due to the existing depressed state in offshore drilling activity, it must rely upon comparable current sales as the proper measure for valuation. Similarly, in *In re Tinsley & Groom,* 38 B.R. 457 (Bankr.W.D. Ky.1984), the court held that, although the expectancy of a resurgent economy may well have some impact upon farm values, this was sheer speculation and lacking in probative value. *See also,* in *In re Saypol,* 31 B.R. 796 (Bankr.S.D.N.Y.1983) (a "mere expectancy of an increase in the value of the collateral" was held not to serve as a basis for retaining the automatic stay).

■ Real estate values in Texas may well rebound. However, no one knows if or when that will happen. It is also possible that real estate values may remain at or near their present levels for an extended period of time. They may even decline further. This court must look at the situation realistically and in the light of the most reasonably commercial disposition of real estate practicable in the circumstances. *Matter of American Kitchen Foods, Inc.,* 2 B.C.D. 715 (Bankr.D.Me.1976). It cannot indulge in speculation.

The present market value for the Round Tree Apartments is therefore found to be $3,500,000. Because the outstanding liens and encumbrances exceed that sum, the debtor lacks equity in the property.

## IS THE PROPERTY NECESSARY TO AN EFFECTIVE REORGANIZATION?

■ The key word in analyzing this second element under § 362(d)(2) is "effective." Most courts have adopted what is known as the feasibility test. *In re Cablehouse, Ltd.,* 68 B.R. 309 (Bankr.S.D.Ohio 1986); *In re Craghead,* 57 B.R. 366 (W.D. Mo.1985); *In re Anderson Oaks,* 77 B.R. at 108; *Matter of Terra Mar Assoc.,* 3 B.R. 462 (Bankr.D.Conn.1980); *In re Boca Development Assoc.,* 21 B.R. 624 (Bankr.S.D. N.Y.1982). Under this test, the debtor must show that there is a reasonable probability of a successful reorganization within a reasonable time. This proposition was recently affirmed by Justice Scalia in *United States Savings Association of Texas v. Timbers of Inwood Forest Associates Ltd.,* — U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Justice Scalia declared that there are situations early in the chapter 11 proceedings—even during the initial 4–month period within which the debtor has the exclusive right to submit its plan—where relief from stay under § 362(d)(2) is appropriate. Each case must be viewed on the basis of its own particular facts, and there must be a balancing of the interest of the debtor with the interest of the secured creditor in its collateral. *See, In re Diplomat Electronics Corp.,* 82 B.R. 688 (Bankr.S.D.N.Y.1988), in which the court, guided by *Timbers,* granted the creditor's motion for relief from stay pursuant to § 362(d)(2) during the 4–month exclusive period in which the debtor had to file its plan.

There is also a contrary line of cases which applies the necessity test. Under this standard, the debtor need not show a reasonable likelihood of a successful reorganization. All that need be shown is that no reorganization is possible without the property. *See, In re Padgett,* 74 B.R. 65 (Bankr.S.D.Ohio 1987); *In re Koopmans,* 22 B.R. 395 (Bankr.D.Utah 1982); *In re*

*Rassier*, 85 B.R. 524, 17 B.C.D. 668 (Bankr. D.Minn.1988). This court rejects the necessity test. That test ignores the word "effective" appearing in § 362(d)(2) and is contrary to Justice Scalia's pronouncement in *Timbers*. This court adopts the feasibility test as constituting the better reasoned view.

Using the feasibility test as its guidepost for interpreting "effective reorganization," the debtor's plan shall now be analyzed because it provides the basis for determining whether the debtor can successfully reorganize. The plan is dependent upon many contingencies, unknown factors and pure speculation. It is based upon the debtor's ability to acquire at least $600,000 through a Private Placement Offering within 120 days after confirmation. Should the debtor succeed in this regard, a portion of the funds would be used to pay certain pre-petition general unsecured claims and outstanding mechanics' and materialmen's liens. However, the claim of the debtor's managing agent, National Realty Management, Inc. ("NRMI"), would remain unpaid. This is by design, since the debtor would then have a friendly impaired class available to vote in favor of its plan. The debtor hopes that this would enable it to invoke "cram down" in order to defeat ConCap's anticipated rejection of the plan. The debtor failed to produce any evidence of commitments by parties willing to participate in this Private Placement Offering. Furthermore, Mr. Vishnevsky testified that he would not make any commitment at this time to personally subscribe to the Private Placement Offering. He also stated that he had never attempted to raise any funds for a debtor who was involved in a pending chapter 11 reorganization proceeding. The debtor's ability to accomplish this task is therefore extremely doubtful.

■ It would be an exercise in futility for the debtor to even attempt to raise the $600,000 under its proposed Private Placement Offering. This is because cram down cannot be invoked for several reasons.

First, in order to apply cram down, there must be at least one impaired class of creditors, not including insiders, that approve the plan. NRMI, being the debtor's property managing agent, is an "insider" under § 101(30)(F) of the Bankruptcy Code and is therefore ineligible. Next, a requirement of cram down is that the plan be "fair and equitable" as to a dissenting impaired class of creditors. This means that ConCap, as a dissenting impaired class, must receive cash payments with a present value as of the plan's effective at least equal to the value of its collateral. ConCap is entitled to the prevailing market rate of interest on the deferred installments. *See*, G. Treister, J. Trost, L. Forman, K. Klee, R. Levin, *Fundamentals of Bankruptcy Law* 395 (1986). The debtor's plan provides for an escalating interest rate, commencing at 5% in the first year with gradual increases up to 9.5% in the tenth year and producing an average interest rate of approximately 7%. That rate is well below the prevailing interest rates in Texas for similar loans,[5] when considering the risk involved, loan duration and nature of the collateral. 5 *Collier on Bankruptcy*, § 1129.03 at pp. 1129-62 to 1129-65 (15th Ed.1988). Also, Mr. Vishnevsky admitted that the plan would not be feasible if the debtor was required to pay a fixed interest rate of 10%, 8% or even 7% for the duration of the plan. Because the interest rates under the plan are not within the acceptable range of prevailing rates, the plan is not "fair and equitable" to ConCap and the cram down test has not been satisfied.

■ There are other reasons why the debtor's plan cannot work. First, it fails to provide for the unsecured portion of ConCap's claim which will total approximately $200,000 should ConCap decide not to exercise its § 1111(b)(2) election (in which case ConCap would then be entitled to participate as an unsecured creditor). Second, the debtor, in note 6 of its disclosure statement, recognizes its inability to pay interest on the proposed $600,000 Private Place-

---

**5.** According to the Love & Dugger appraisal, the prime interest rate in Texas is 9.25%, with commercial mortgages currently available in Texas for 9.5% to 10.5% for prime investment properties for terms of 10 years. *See*, Love & Dugger appraisal, p. 85.

ment Offering on a current basis. As part of the Offering, any unpaid interest will accrue interest at 17%. This means that if there is no repayment on the Offering during the plan period, the total obligation under the Offering (including principal, interest and default interest) will total approximately $1,383,000 after 10 years. Except for the debtor's hopes of selling the property at a price sufficient to satisfy this obligation, there is no other provision for its repayment in the plan. Third, the plan is premised upon unrealistic projections unsupported by the debtor's past financial history. The debtor's cash flow analysis assumes future maintenance and replacement costs of approximately 8.87% of gross revenues. This compares with its actual past maintenance and replacement costs, as a percentage of gross revenues, of 22.4% in 1986 and 17.61% in 1987. The debtor has also calculated its anticipated administrative expenses at $58,000 in the first year of the plan with annual increases of 5% thereafter. That compares with its actual past administrative expenses of $115,000 in 1986 and $267,000 in 1987. Nevertheless, even assuming the debtor is able to meet its projections and the huge losses of recent years ($550,000 in 1986 and $840,000 in 1987) are reduced, the projections still recognize that the income from the property will be insufficient to pay the operating expenses, real estate taxes and debt service which will be incurred each year under the plan. The plan, therefore, hinges upon yearly cash infusions from its general partner, Mr. Vishnevsky, totalling approximately $340,000 over the 10–year life of this plan. This negative cash flow and need for financial support from Mr. Vishnevsky provide further proof of the plan's lack of viability.

Although the debtor intends to reduce its costs and increase its rentals, its program is "too little, too late." There is no reasonable possibility for reorganization.

In *In re Anderson Oaks*, Judge Clark, confronted with a similar fact situation, aptly summed it up as follows, 77 B.R. at 112:

"Here, boiled down to its essence, is an attempt by an investor group to use the Bankruptcy Code as a device with which to force its lender into renegotiating their loan. It is true that section 506 does contemplate limiting a secured claim to the value of the collateral securing the claim. It is equally true that section 1129(b) contemplates forcing an involuntary loan upon recalcitrant creditors in order to attain confirmation of a plan. It is not true, however, that those provisions are available to any investor looking to refinance his loan. The requirement of at least one impaired class of creditors who have affirmatively voted for the plan *and who are not insiders* must be met in order to invoke the 'cram-down' provisions of section 1129(b). In short, there must be some one other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that justify resort to cram down. If cram down is not available, it is pointless to further consider a plan which requires cram down for its success. Because the reorganization which these Debtors contemplate is not possible, it follows as a matter of logic that the debtors have failed to carry their burden that an effective reorganization is possible."

## SUMMARY

The debtor's plan is heavily sprinkled with uncertainty and unjustified optimism. Its financial history and reasonable future outlook reveal:

1. In the immediate past—heavy losses.

2. In the immediate future—a reasonable expectation of continuing losses.

3. Beyond the immediate future—uncertainty.

After weighing the certitude of immediate continuing losses against the debtor's visionary expectations of eventual success, it is clear to this court that the automatic stay must be lifted pursuant to § 362(d)(2). As the Second Circuit stated in *Matter of Bergman*, 585 F.2d 1171 (2d Cir.1978) at 1179:

"Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."

It is, therefore, not necessary to consider ConCap's alternative ground for relief under § 362(d)(1).

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.