### In re PARK AVENUE PARTNERS LIMITED PARTNERSHIP, Debtor.

**Bankruptcy No. 88–02877.**

United States Bankruptcy Court, E.D. Wisconsin.

Dec. 23, 1988.

James O. Huber and Leonard G. Leverson, Foley & Lardner, Milwaukee, Wis., for Fannie Mae.

Paul G. Swanson, Oshkosh, Wis., David V. Jennings, III, Milwaukee, Wis., for debtor.

## DECISION

M. DEE McGARITY, Bankruptcy Judge.

## PROCEDURE

This case came before the court upon the motion of Federal National Mortgage Association ("Fannie Mae"), first mortgage holder of the real estate known as Dutchman's Creek Apartments, for relief from the automatic stay and for dismissal of the case for bad faith filing. Dutchman's Creek Apartments is the sole asset of the debtor. The debtor objected to the relief requested by Fannie Mae.

The debtor countered with a motion to determine the status of Fannie Mae's claim and for the valuation of the real estate. The debtor anticipates including a cramdown provision in its proposed plan, and the valuation is intended for that purpose as well as for the pending motions. Finally, the debtor filed a motion to employ Century Management Group, Ltd. as the property management firm to manage the apartment complex, although the debtor has also argued that no approval is necessary because a property manager is not a "professional person" requiring court approval under 11 U.S.C. § 327. Fannie Mae objected to the appointment. Since the evidence expected to be submitted by each side was relevant to all pending motions, a decision was deferred until all evidence could be presented. Those hearings were held on October 24, October 28, November 3 and November 14, 1988.

Prior to the bringing of the instant motions, an order authorizing use of cash collateral was entered. The provisions of that order had been agreed to by the debtor and Fannie Mae at the time of the hearing before Judge Eisenberg on July 13, 1988, and the written order was entered on August 19, 1988.

After being thoroughly advised of the matter, the court makes the following determinations:

1. Fannie Mae's motion to dismiss is denied.
2. The value of the property known as Dutchman's Creek Apartments is $5,300,000.
3. Fannie Mae's motion for relief from the automatic stay is granted.
4. Debtor's motion to appoint Century Management Group, Ltd. as its property management firm is not necessary and, accordingly, is denied.

## FACTS

Park Avenue Partners Limited Partnership was formed on January 24, 1984, for the purpose of acquiring Dutchman's Creek Apartments, a 405 unit apartment complex in Ashwaubenon, Wisconsin, a suburb of Green Bay. The purchase price was $7,395,000. The sole general partner of the

debtor is Century Capital Group, a general partnership originally consisting of Wayne C. Chaney and J. Peter Jungbacker as general partners. In 1987, Century Capital Group, Ltd., a corporation, was formed and became another general partner of Century Capital Group. Jungbacker and Chaney each own 50% of the stock of Century Capital Group, Ltd. The sole limited partner of the debtor is FB MTP Partners, a New York general partnership holding employee benefit funds of First Boston Corporation.

Century Capital Group, Ltd. has three wholly owned subsidiaries. These include Century Capital Group Securities, Ltd., Century Capital Group Development, Ltd. and Century Management Group, Ltd. ("CMG"). CMG has been managing Dutchman's Creek and other real estate projects of which Century Capital Group, Ltd. or Century Capital Group is a general partner and continues to do so pending a determination of CMG's status as a professional person and approval of appointment, if necessary. Chaney and Jungbacker are unpaid officers and directors of CMG. CMG has a third director, John Helling, who is also its president, although he testified that he had never attended a directors' meeting. Fannie Mae's representative, Pat Lyerla, testified that Fannie Mae does not have confidence in CMG and will not enter into a voluntary workout or agree to a plan involving CMG.

At the time of its purchase from Dutchman's Creek Limited Partners, the apartment complex was subject to an underlying secured debt which had approximately one and one-half years to run. When the debt matured, the limited partnership procured financing through Bank One, the servicing agent for Fannie Mae. At the time of filing the debtor's Chapter 11 petition on June 29, 1988, the principal balance was $5,607,098.81. Accrued interest, late charges and an advance for delinquent real estate taxes brought the total amount due and owing Fannie Mae on June 29, 1988 to $6,020,414.52. In addition, the property is subject to the second mortgage of the seller, Dutchman's Creek Apartments Limited Partnership, in the amount of $1,659,080.

Chaney and Jungbacker personally guaranteed the second mortgage. There are unpaid real estate taxes in the amount of approximately $95,000 for the second half of 1987. Since, according to appraisers hired by the parties, the property is worth at most $5,300,000, it was agreed that the debtor has no equity in the property.

When the debtor acquired the property in 1984, the vacancy rate was about 6%. In 1985 and 1986, all sides agree that the Green Bay area experienced a construction boom resulting in a substantial increase in the number of apartment units available. This "soft market" contributed to an increase in the debtor's vacancy rate. Also, the debtor refinanced with Fannie Mae at a rate of 12.5%, which was a higher interest rate than expected and which decreased the amount of cash available for capital improvements and maintenance. The Fannie Mae mortgage is "locked in" so it cannot be prepaid for at least five years.

All observers agree that the buildings suffer from substantial deferred maintenance and are in below average condition, although estimates concerning the amount necessary for maintenance and improvements ranges from $290,000 to $1,550,500. This deferred maintenance is also viewed by all parties as a significant cause of the high vacancy rate. Other factors, which are discussed at greater length below, may also have contributed to the vacancy rate, which rose to a high of 28% in July, 1988. The vacancy rate has been reduced since filing of the Chapter 11 so it is currently around 19%.

The complex consists of eleven 2–½ story buildings which were constructed between 1975 and 1977. There are 277 one bedroom units and 128 two bedroom units, all with one bathroom. The units are relatively small, consisting of 542 square feet for the one bedroom units and 698 square feet for the two bedroom units. Weighted average rent is $270 per month per unit. Each unit has appliances and individual wall air conditioners. Tenants tend to be young with incomes in the $7,000 to $10,000 range. Many are single people, occupying the apartments as roommates.

Additional facts will be set forth in the appropriate parts of this decision.

## MOTION TO DISMISS

■■■ Fannie Mae has asked the court to dismiss the debtor's petition under 11 U.S.C. § 1112(b)(2) on the grounds that the debtor is unable to "effectuate a plan." This may be done at any time, and it is not necessary that the creditor wait until the debtor has proposed a plan or until the debtor's exclusive right to file a plan has expired. Whether the debtor has any possibility of achieving an effective reorganization by restructuring the business or by orderly liquidation, is unquestionably at issue when the debtor's good faith in filing is questioned. *See In re Park Timbers*, 58 B.R. 647 (Bankr.D.Del.1985). However, it is only one issue. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir.1987); *In re Albany Partners, Ltd. v. Westbrook*, 749 F.2d 670, 674 (11th Cir.1984); *In re Levinsky*, 23 B.R. 210, 218 (Bankr.E.D.N.Y.1982), citing *In re Loeb Apartments, Inc.*, 89 F.2d 461, 463 (7th Cir.1937), rehrng. denied. The court's focus must be on whether the totality of the circumstances lead to the conclusion that debtor *intended* to file the petition for a purpose that is inconsistent with the purposes of Chapter 11. *Id.*[1]

■■■ The single asset debtor is often singled out as the type of debtor most likely to be subject to dismissal on the grounds of a bad faith filing. If the sole reason for filing is to frustrate the secured creditor, and there is no corresponding benefit to any other party, then the case should be dismissed. *In re Park Timbers, Inc., supra*. It is undisputed that this debtor has only one asset. The petition was filed to prevent entry of a judgment of foreclosure. The debtor has no business other than owning of the apartment complex as an investment. It has no employees. CMG is responsible for day to day operations. A logical first impression might be that this is the sort of two party dispute that should be resolved in state court as part of the foreclosure action rather than in bankruptcy court.

Other factors arose in this case, however, which militate against dismissal for lack of good faith. Although the court finds that the debtor has no possibility of effective reorganization, as is discussed more fully in this court's decision concerning the lifting of the automatic stay, this is only one factor in assessing good faith. The court is satisfied that the debtor is attempting to reorganize, and the petition was filed in good faith. Principals of the debtor have attempted to obtain refinancing. The attorney for the debtor attempted to negotiate a workout acceptable to Fannie Mae. The letter of debtor's counsel dated October 18, 1988, indicates that a considerable amount of time and thought were devoted to attempting to formulate a feasible and mutually acceptable plan. This was not a half-hearted attempt to cover up an otherwise impermissible filing. Furthermore, considerable work was done to improve the property. For example, Mr. Helling, president of CMG, testified that at least 75 windows had been replaced, 20 patio slabs had been mud-jacked, 5 to 10 patio slabs were replaced, 40 balconies were repaired, 66 units had new carpeting installed, 5 hallways were carpeted, new signs were put up, part of the parking lot was patched, and considerable amounts of landscaping and grading had been done. The improvements made are consistent with an intent to increase the productivity of the property. If improved, the property could be held and eventually sold to a third party at a price higher than would otherwise be available in the property's condition at the time of filing. Indeed, even at a cramdown value most beneficial to the debtor, the property *must* be improved and income increased if reorganization were ever to be possible. Such efforts are inconsistent with the allegation that the debtor's purpose in filing was solely to hinder or delay the creditor. Therefore, Fannie

---

**1.** Cohn, "Good Faith and the Single-Asset Debtor" 62 American Bankruptcy Law Journal 131, 139 (Spring 1988).

Mae's motion to dismiss the case on the grounds that it was filed in bad faith will be denied.

## VALUATION OF PROPERTY

Even though the debtor and the creditor agree that the debtor has no equity in the property, the value of the property is critical to the debtor's defense to the motion to lift the automatic stay. Under 11 U.S.C. § 362(d)(2)(B), the debtor must prove that it can propose a feasible plan; that is, it has the possibility of achieving an effective reorganization. *In re National Real Estate Limited Partnership II*, 87 B.R. 986 (Bankr.E.D.Wis.1988). Such a plan may include a reduction in the value of a secured claim if the value of the debtor's property is less than the amount of the debt. 11 U.S.C. § 1129(b). The debtor must also prove that it can afford the creditor adequate protection under 11 U.S.C. § 362(d)(1), if the creditor is entitled to adequate protection. *United Savings Association of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Consequently, the value of the property must be determined at this time.

Each side presented testimony of an appraiser, and each appraiser has considerable experience in appraising property of this type. Fannie Mae employed Daniel L. Gagnow of DLG, Inc., Appleton, Wisconsin. Mr. Gagnow received a degree in building construction from the University of Wisconsin–Stout in 1970. He had his own construction business and has also been active in real estate sales. He has been appraising property since 1972 and has been exclusively in the appraisal business since 1982. He received his MAI designation in 1983. Most of his experience has been in Wisconsin. He valued the property at $5,300,000.

The debtor's appraiser was Michael J. Maglocci of Joseph J. Blake and Associates from Chicago, Illinois. He is the regional manager for the firm, which has offices nationwide. The Chicago office covers eight midwestern states. Mr. Maglocci received his MAI designation in 1983. Although he does not have the years of experience that Mr. Gagnow has, nor has he ever been in sales or construction, he has been involved in appraising numerous large projects in various areas of the country. Since this is a project potentially having a nationwide market (the debtor's limited partner is not from this region), this breadth of experience may be as valuable as extensive regional experience. Mr. Maglocci valued the property at $4,900,000.

Both appraisers attempted to arrive at a fair market value of the property in its present condition. Both used the cost, income and sales comparison approaches, and both agreed the income approach provides the most dependable analysis for this property. Each approach involves the application of mathematical formulae in an attempt to make value as objective as possible. Underlying each mathematical analysis, however, is a subjective judgment used in determining the various rates inserted in the formulae or in adjusting for differences in comparables. A fraction of a percentage point can result in differences of many thousands of dollars in a project of this size. Thus, a court presented with conflicting appraisals must determine value based on the credibility of the appraisers, the logic of their analyses, and the persuasiveness of their subjective reasoning. This court finds Mr. Gagnow's appraisal more persuasive and determines the value of Dutchman's Creek Apartments to be $5,300,000.

Mr. Gagnow's methods in arriving at his $5,300,000 valuation were thorough and convincing. Several illustrations will demonstrate the overall reliability of his conclusions. For example, in making his cost analysis, Mr. Gagnow's assistant measured every building; Mr. Maglocci relied on measurements of plans, which were obviously changed in construction, resulting in almost 16,000 fewer square feet than actually exist. Using Mr. Maglocci's cost per square foot, approximately $575,000 would have been added to Mr. Maglocci's cost figure, which would have made his cost approach figure higher than Mr. Gagnow's.

Mr. Maglocci lacked thoroughness in other ways. He and his associate inspected

only 31 to 33 units as compared to Mr. Gagnow and his associate, who inspected 72 to 73. Mr. Maglocci incorrectly described the buildings as having gutters and downspouts, which they do not. Mr. Gagnow was in every building; Mr. Maglocci was not. Mr. Gagnow's description of the property was much more thorough as, in general, his overall methods appeared to be.

Another manner in which the appraisers differed in their cost approaches was in their analyses of functional and external obsolescence as deductions from replacement cost. Functional obsolescence is the decrease in value due to incurable factors such as apartment size, concentration of less desirable one bedroom units, floor plans, or quality of materials. Mr. Gagnow estimated this to be 5% of cost new. External obsolescence is due to outside factors such as location, economy in the area and outside competition. Mr. Gagnow used market data to arrive at a reduction of $350,000 for this factor. This represented the loss of income from excess vacant units caused by overbuilding of apartments in the Green Bay area, a measure of external obsolescence. These two depreciation factors, when combined with normal physical depreciation and deferred maintenance, resulted in an overall depreciation factor. Overall depreciation was deducted from replacement cost to arrive at a cost value of $5,400,000.

On the other hand, Mr. Maglocci arrived at a combined functional and external obsolescence figure as part of his reconciliation of the various approaches. First, physical depreciation was deducted from replacement cost. That amount was then deducted from the value he had derived using the income approach in another section of the appraisal. The difference was attributed to functional and external obsolescence. The obsolescence factors were merely the difference in the results of two mathematical calculations. They were meaningless as independent forces affecting value.

Mr. Maglocci's comparison sales approach is likewise unpersuasive. Whereas Mr. Gagnow's comparable figures were actual sales, Mr. Maglocci used two unaccepted offers as "indications" of comparable sale prices. This is inherently unreliable. An offer that is not accepted is probably too low; otherwise, it might have been accepted. A way of using comparable sales in valuing the subject property is to calculate the effective gross income multiplier ("EGIM"), sales price divided by gross income, for the comparables. An appropriate EGIM for the subject is applied to the subject's projected net operating income. Mr. Maglocci used 4.5 for Dutchman's Creek, even though the EGIMs for actual sales were 4.97 to 6.69. The unaccepted offers had lower EGIMs, as one would expect for a value that is too low. Using the same value of capital additions and absorption costs, an EGIM as low as 5.0 would have produced a cost approach figure of $5,729,379 for the subject property, which is substantially greater than the $5,100,000 figure determined by Mr. Maglocci. The price per apartment unit of actual sales, as opposed to unaccepted offers, also supports a higher market value than that derived by Mr. Maglocci. These factors make Mr. Gagnow's comparison sales figure of $5,400,000 more credible.

The income approaches to market value used by the appraisers created the most controversy at trial. Both sides agreed that this is the most appropriate measure of value for a project of this type, and it is here that the appraisers' judgment is most important. The purpose of the income approach is to determine return on an investment over time. First, the potential income of the subject property is determined. Both appraisers calculated income that should be produced by the property if occupancy is stabilized, and their estimates are quite close. Stabilized estimated operating expenses and replacement reserves were similarly estimated and are also fairly close. The question then becomes how much an investor will spend on a project of this nature to obtain the return calculated. Appreciation in value is also a component of return. It is assumed that investors will spend more for a safe investment than for a risky one. Consequently, if investors are willing to purchase a risky investment,

then the return should be relatively higher to compensate for assuming the risk.

Various assumptions consisting of multipliers and rates may be used to translate the projected net operating income into a market value. A common test is to apply a capitalization rate to the projected net operating income to arrive at the fair market value. This "cap rate" is a multiplier reflecting the risk associated with an investment; a higher cap rate results in lower value and vice versa. Mr. Gagnow used comparable sales information to determine the cap rates for other projects (including the 1984 sale of the subject), between 6.61% and 8.45%. Because of the size and condition of the subject, the perceived risk is greater, approximately 9% to 9.5%. Mr. Maglocci used 11.9%, but his method of deriving this rate is questionable. By a complicated train of assumptions involving lender rates (11.13% in his model, which other testimony indicated may have been too low) and an estimated equity dividend rate (12%, but arrived at without market data), he used the simple band of investment method to derive his 11.9% cap rate. This is too high to be reasonable based on reported data.

Furthermore, Mr. Maglocci estimates a 14% equity yield rate, and Mr. Gagnow uses 12%. Mr. Gagnow notes that the yield rates of comparable properties are relatively low, probably because the overbuilt market causes rents overall to be depressed to make the various projects competitive. Using a lower rate is, therefore, consistent with testimony of several witnesses and is more credible. Again, a higher value would be achieved by using a lower yield rate, thus supporting Mr. Gagnow's higher income approach figure.

It is worth noting that the debtor itself in another setting has indicated the 9% to 9.5% cap rate is actually more appropriate for this project than the higher rate espoused by Mr. Maglocci. He argued that a high rate is warranted in determining the value of the property in its present condition. However, in April of 1988, a letter to the limited partner from Wayne C. Chaney for Century Capital Group postulated three scenarios for dealing with the project's financial troubles. Two scenarios envisioned immediate liquidation, and possible proceeds were arrived at using cap rates of 9% to 9.5%.

If there is a weakness in Mr. Gagnow's appraisal, it is in the area of needed repairs and capital improvements. Mr. Maglocci estimated the needed improvements at $290,000 and Mr. Gagnow at $1,550,500. An architect, Michael Zweiger, testified convincingly that many of Mr. Gagnow's suggestions were excessive. For example, it is not immediately necessary to replace all of the appliances in 50% of the units for $293,000. This could be done on an as needed basis. Boilers could also be replaced as needed, rather than all at once for $50,000. He felt that enclosing stairways for $150,000, with associated costs such as insulation and modification of air conditioner placement or exhaust, was not necessary. The parking lot could be patched for $30,000 rather than resurfaced for $150,000. The roof could also be patched. On the other hand, Mr. Maglocci proposed spending approximately 80% of the improvements budget on carpet. Carpet in undoubtedly necessary, but a project of this size that has had only $112,250 spent for improvements over the last 4-½ years is undoubtedly in need of more than carpet. An appropriate figure is probably somewhere in between. However, each approach used by Mr. Gagnow contains a deduction of $1,550,500 for deferred maintenance to arrive at his final values. Consequently, reducing his estimate of necessary improvements produces an increase in the fair market value of the property. It is, therefore, logical that the property may be worth more than $5,300,000, but the court does not need to speculate how much more.

Finally, the reconciliation of the three approach figures is fairly close for Mr. Gagnow, indicating the reliability of the assumptions he used in the various calculations. Mr. Maglocci's wide divergence in the amounts derived indicates less reliability, notwithstanding his assertion that it can be explained as external and functional ob-

solescence. Therefore, the court accepts Mr. Gagnow's valuation.

### AUTOMATIC STAY

■ Fannie Mae moved to have the automatic stay, imposed under 11 U.S.C. § 362(a), lifted to allow it to foreclose on Dutchman's Creek Apartments. Under 11 U.S.C. § 362(d), the court shall grant such relief if there is cause, including lack of adequate protection. (11 U.S.C. § 362(d)(1)). Since Fannie Mae is undersecured and the property is not declining in value, it appears that Fannie Mae would not be entitled to adequate protection at this time if a feasible plan were on the horizon. *United Savings Association v. Timbers of Inwood Forest Associates, Ltd., supra.*

The stay may also be lifted if the debtor has no equity in the property, as is the case here, and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). This court finds that the property is not necessary to an effective reorganization, and an order lifting the stay will be issued to allow Fannie Mae to proceed with its foreclosure. 11 U.S.C. § 362(d)(2). The stay will also be lifted as to Dutchman's Creek Apartments Limited Partnership to allow it to participate in the foreclosure.

The key statutory language in 11 U.S.C. § 362(d)(2) is that "the property is not necessary to an *effective* reorganization." (emphasis added) The debtor has the burden of proof as to this element. *United Savings Association of Texas v. Timbers of Inwood Forest, Ltd., supra*, 108 S.Ct. at 632; *In re National Real Estate Limited Partnership II, supra*, at 989. It is insufficient for the debtor to show merely that reorganization is impossible without the property. *Id.* That much is obvious to all concerned. The debtor must also show that reorganization is feasible within a reasonable period of time. *Id.*

The evidence submitted at trial showed convincingly that any plan that the debtor is capable of performing cannot meet the standards for confirmation under 11 U.S.C. § 1129(b); likewise, any plan that does meet confirmation standards is beyond the ability of the debtor to execute. When effective reorganization is impossible, the purpose of Chapter 11 and the automatic stay cannot be fulfilled. Accordingly, the stay must be lifted. *In re National Real Estate Limited Partnership II, supra*, at 991–92; *In re 8th Street Village Limited Partnership*, 88 B.R. 853, 856–57 (Bankr. N.D.Ill.1988); *In re Anderson Oaks (Phase I) Limited Partnership*, 77 B.R. 108, 110–11 (Bankr.W.D.Tex.1987); *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635, 641 (E.D.N.Y.1980).

■ An objecting secured claimant receiving deferred cash payments in a plan of reorganization is entitled to "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). This has been interpreted to mean the total payments must be equal to the present value of the secured claim. *In re 360 Inns, Ltd.*, 76 B.R. 573, 585–94 (Bankr.N.D.Tex.1987); *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503, 1505 (9th Cir. 1987); *United States v. Neal Pharmacal*, 789 F.2d 1283, 1286; 5 *Collier on Bankruptcy* ¶ 1129.03(4)(f)(i) at 1129–60 to 66 (15th ed. 1988). The cases state, and the debtor does not dispute, that the current market rate of interest is used to determine the present value, and this rate is determined by the court on a case-to-case basis. *Id.* The debtor goes on from this principle and, citing *Camino Real, supra*, argues that courts are in disagreement as to how the current market discount rate is determined. This court does not find the lack of harmony that the debtor suggests. There does, however, appear to be a wide diversity in the evidence presented to each court. In this case, the court must consider the prevailing market rate of interest based on the evidence presented, with appropriate adjustments commensurate with the terms, duration, value of the collateral and risk. *Collier, supra.* Even though the "loan" in a cramdown plan is involuntary rather than one arising in an arms length transaction,

the creditor is still entitled to the present value of its money in the current market.

The debtor proposes using the current short term treasury rate as a starting point for determining the discount factor. This is a completely riskless loan, currently at approximately 8–½%, backed by the taxing power of the United States government. The debtor then arbitrarily assigns a 1.5% "risk" factor to this project for a discount rate of 10%. The court fails to see that this percentage is supported by the evidence. On the contrary, there was testimony by a mortgage banker, Mr. Dan Pagel, that the prime rate at the time of trial was 10%. The prime rate is the interest rate charged by banks to their best and most dependable customers for short term financing. Could this debtor qualify for the prime rate in this market? Clearly not.

If this debtor does not qualify for prime rate, then it must be determined where it fits in the borrowing market. Mr. Pagel testified concerning current rates and practices among institutional lenders who finance apartment projects. Most are looking for buildings less than twenty years old in a stable or upward moving neighborhood. They should be well occupied, have good management and sufficient capital to weather financial downturns. He doubted that this project, with a vacancy rate of 19%, substantial deferred maintenance, managed by a company that has a number of other projects in Chapter 11 or in default, could obtain *any* financing. Also, the fact that there is no equity in the property means that the claim to be paid is 100% of value, and it is highly unusual for lenders to lend the full value of a project. That situation is unavoidable in the Chapter 11 setting. However, even if a borrower has an adequate down payment and is not in Chapter 11, the interest rates available for a similar borrower with a similar cash flow and occupancy rate will exceed prime. He testified that institutional lenders such as insurance companies would not take a project in this condition. Finance companies will make higher risk loans at 12% to 13% in some instances, but after reviewing the financial records of Dutchman's Creek and speaking with lenders, he believed that 14% is the best that could be hoped for. He also stated that it is rare to find a loan which allows negative amortization (deferring interest payments and adding unpaid interest to principal), but if available, it would generally be added to principal monthly, thereby compounding the interest charges on a monthly basis. Ms. Lyerla confirmed that monthly compounding of deferred interest is the usual practice. Mr. Pagel could see no incentive for a finance company to take a loan providing for as much as 50% negative amortization. Therefore, considering the cash flow, vacancy rate, condition and management, but not considering the Chapter 11 status or the lack of equity, the court finds that the proper discount rate to determine the present value of Fannie Mae's loan is 14%.

Since this court has determined that the property is valued at $5,300,000 and Fannie Mae is entitled to a 14% return on its secured claim, it follows inexorably that the debtor cannot perform any plan that can be confirmed. The debtor has never operated with a positive cash flow. The court was presented with numerous cash flow projections using the debtor's anticipated decreases in vacancies and increases in rents after doing the bare minimum of improvements proposed by Mr. Maglocci. The amounts of the claim in the hypotheticals were from $4,900,000 to $5,300,000, and various numbers for projected income were used. Interest rates of 12% to 14% were applied. The pattern of results makes clear that no plan will work. Fannie Mae's projection of a claim of $5,300,000 at 14% using the debtor's projected income from its October 18, 1988 letter, shows that even with deferral of one-half of CMG's management fees, interest is deferred in every year of the debtor's proposed plan. There would be no principal reduction and no payments for pre-petition real estate taxes. It would be far into the future before the debtor could pay even the interest. Furthermore, it appears that the debtor's 1988 income will not be as high as the debtor predicted. Fannie Mae cannot be compelled to accept so long a deferral of its

claim on the debtor's hope and speculation that it can turn this property around. Such a plan would not meet the "fair and equitable" test of 11 U.S.C. § 1129(b)(1). *See In re 8th Street Village Limited Partnership, supra,* at 859.

Even the debtor's proposal at 10% for $5,100,000 appears untenable. No provision is made for interest on deferred interest, which both Mr. Pagel and Ms. Lyerla testified would be required in the marketplace. The debtor's proposed sale in 1993, which calls for a $3,000,000 to $4,000,000 increase in the value of the property, does not cure its problem. Quite simply, this Chapter 11 won't work. Therefore, the automatic stay must be lifted.

## PROPERTY MANAGER

The question of whether a property manager is a professional person requiring court approval under 11 U.S.C. § 327(a) does not appear to be an issue squarely addressed by courts in previous cases. If the manager does require approval for appointment, it would also be subject to the limitations of 11 U.S.C. § 327(a); that is, it must be a disinterested person. If court approval is not required, neither is disinterestedness. The threshold issue of CMG's status as professional or not under 11 U.S. C. § 327(a) is, therefore, critical to its continued involvement.

The court recognizes that the disqualification of CMG as a player in this scenario would be disruptive to the debtor. Jungbacker and Chaney are general partners of the general partner of the debtor and the only shareholders of the general partner's third general partner. They have, as the only shareholders of CMG's parent company, a mechanism in place to manage and control the debtor's property. Requiring the removal of CMG would no doubt result in diversion of the principals' time and attention away from other aspects of the debtor's reorganization and other Chapter 11 reorganizations in which those two individuals are involved. Since CMG is not being paid a management fee at this time, there could also be an expense related to hiring another manager. The period of

time that the debtor remains in possession of the property may be short, and change at this point would probably not be prudent.

■ The debtor argues that CMG is not a professional person subject to court approval and the disinterestedness requirement of 11 U.S.C. § 327(a). The latter is a significant obstacle. Although the debtor argues that CMG is disinterested even if the property manager is a professional person, that argument doesn't even pass the "straight face" test. Can the subsidiary of the general partner of the general partner of the debtor be disinterested? The definition of "disinterested person" requires that the person not be an "insider." 11 U.S.C. § 101(13)(A). The definition of "insider" includes a list of relationships that are not exhaustive. Among others, "insider" includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(30)(E). "Affiliate" means an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." 11 U.S.C. § 101(2)(D). CMG has certainly been managing all of the property of the debtor under its management agreement. *See also* 11 U.S.C. § 101(30)(F) (insider includes "managing agent" of the debtor); *In re National Real Estate Limited Partnership II, supra,* at 991. Even though CMG is not a general partner of the debtor (11 U.S.C. § 101(30)(C)(iv)), it is a subsidiary of the corporation that is the general partner of the general partner of the debtor. Layers of entities are added, but there are no additional human beings other than Jungbacker and Chaney with ownership or control rights that are interjected into those layers. Therefore, CMG is not a disinterested person.

The only case that either counsel or the court have found dealing with the status of a property manager assumes that the manager is a professional person under 11 U.S.C. § 327(a). *In the Matter of Park Terrace Townhouses v. Wilds,* 852 F.2d 1019 (7th Cir.1988). In that case (*"PTT"*), the debtor, as seller, entered into a sales contract with Mr. Wilds for the townhouses

owned by the debtor, subject to financial terms to be negotiated later with third parties. The agreement provided that "Seller shall deliver to purchaser *full and complete possession and management* of Park Terrace following the execution of this agreement." (Emphasis added.) No salary or other compensation was provided pending final sale. After Mr. Wilds managed the property for several months, apparently quite effectively, the debtor sold the property to another party with court approval. Mr. Wilds applied for compensation as a property manager as an administration expense. The Court of Appeals noted that "The bankruptcy court found that PTT regularly employed professional persons to assume the responsibilities in question assumed by Wilds." *Id.* at 1022. The court allowed compensation to Wilds under 11 U.S.C. § 327(b), even though he had not been appointed by the court under 11 U.S.C. § 327(a), because professional persons regularly employed by the debtor on salary are compensable without court approval. 11 U.S.C. § 327(b). Since the persons previously doing Mr. Wild's work were salaried, he also qualified for compensation under 11 U.S.C. § 327(b).

■ In this case, CMG's compensation was based on a percentage of gross receipts, less security deposits, and was not a salary or set fee. *See In re Four Star Music Co., Inc.,* 42 B.R. 191, 195 (Bankr.M. D.Tenn.1984); *In re Cummins,* 8 B.R. 701 (Bankr.C.D.Cal.1981) (real estate broker on commission did not qualify for compensation without court approval under 11 U.S.C. § 327(b)). Accordingly, if CMG is a professional person, qualification for compensation without court appointment under 11 U.S.C. § 327(b) is not available. Although CMG would waive prepetition fees, its application does not offer postpetition services free of charge.

It does not appear that the issue of whether a property manager met the evolving case law definition of a professional person was contested or analyzed in *PTT.* It appears that the court could also have allowed compensation under 11 U.S.C. § 503(b)(1)(A), and the result that could

have been achieved under either section prevented an obvious injustice to Mr. Wild. Perhaps such analysis was unnecessary in that case. In many instances in which the courts have dealt with the employment or compensation of professional persons, their status as such is assumed rather than contested. *See In re Windsor Communications Group, Inc.,* 68 B.R. 1007, 1011 (E.D. Pa.1986), and numerous examples cited therein. Issues that have been resolved without having been contested do not have the persuasive force of issues that are fully litigated.

■ It appears to this court that the duties contemplated by and for CMG are distinguishable from those assumed by Mr. Wilds in *PTT,* and in this case the property manager is not a professional person.

What constitutes a professional person under 11 U.S.C. § 327(a) was summarized in *In the Matter of Seatrain Lines, Inc.,* 13 B.R. 980 (Bankr.S.D.N.Y.1981), which found that maritime engineers were not professional persons as that term is used under the Bankruptcy Code. While engineers may be highly educated and have specialized expertise in their field, they do not have a central role in the administration of the bankruptcy case. *Id.* at 981. They are important to the functioning or mechanics of the debtor's business, but their employment was not sought because of a need that arose incident to the bankruptcy. Such a role may be contrasted with that of an attorney who appears in bankruptcy proceedings, an appraiser required to value property of the estate, a realtor disposing of property of the estate, or an accountant responsible for tax and court reporting requirements. The degree of autonomy and discretion exercised by a professional may also be a consideration in determining whether a person is a professional, hence the requirement that the professional be disinterested. *In re Frederick Petroleum Corporation,* 75 B.R. 774, 780 (Bankr.S.D.Ohio 1987). There are also considerations of whether the debtor employs the particular type of professional in its normal business operation, as well as the practices of similar businesses in that re-

gard. *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986) (lobbyists are not professional persons under 11 U.S.C. § 327(a)). *See also In re Carolina Sales Corp.*, 45 B.R. 750 (Bankr.E.D.Wis. 1985) (management consultants who had no inside relationship to the debtor were professionals).

The property manager for PTT had unfettered discretion in how the property was managed. The contract for sale gave him "complete possession and management." CMG's authority under its Property Management Agreement (which to date has not been assumed or rejected by the debtor in possession) was not so broad. For example, CMG did not have the right to set rents. Mr. Helling, CMG's president, testified that he recommended rent increases but the owners made the final decision. CMG was to make and supervise repairs, alterations and decorating, but any expenditure over $2,500 required the owner's approval. The management agreement refers to payment of real estate taxes by invoice, but it appears that in practice the owner decided when taxes were to be paid. CMG was not responsible for debt service. As a practical matter, the same individuals that make decisions for the owner are also the officers and directors of CMG and the owners of CMG's parent. In short, the debtor is in complete control. CMG is not an independent professional person, and this court finds that 11 U.S.C. § 327(a) does not apply. Since court approval is not necessary for CMG's employment, the debtor's motion for such approval is denied.

■ It should not be inferred from this ruling that the court has no say in the management of the debtor's estate. There was considerable testimony regarding the quality of CMG's management. Mr. Jungbacker testified that 46% of the units under CMG's management are in Chapter 11 or in default. While the lack of capital may have contributed to the deferral of some repairs and improvements, it is no excuse for dirty hallways. Surely there were mops and brooms on hand. Ms. Lyerla testified that she saw an unattached stair tread and a loose stair rail. This was confirmed in Mr. Gagnow's appraisal. A door was loose, although it could have been fixed with only a screwdriver. Dutchman's Creek shares a private road, Viking Drive, with another CMG property, Foxcroft. Yet, until this winter, Dutchman's Creek has assumed full responsibility for snow removal and repairs of Viking Drive. An independent manager would not have tolerated such exploitation by another project. Also, there was a sign pointing to Foxcroft at the entrance of Dutchman's Creek. Mr. Jungbacker testified that he saw it but did not order its removal. Even if the tenant populations of the two projects are different and they are not in direct competition, an independent manager loyal to Dutchman's Creek would not have suffered this situation for long.

Under 11 U.S.C. § 1107(a), the court may prescribe limitations on the debtor in possession's operation of the debtor's business. Ordinarily, payment of an agent managing the property under the direction of the owner would be made in the ordinary course of business without court approval. In this case, however, the relationship between the debtor and CMG and CMG's past performance suggest that court scrutiny is warranted. Also, it appears that there is a question concerning the payment or recoverability of $34,649.46 for pre-petition management fees, which shall be considered in any application for fees and may be subject to recoupment by the bankruptcy estate. Therefore, before any payment is made to CMG by the debtor, CMG shall file an application under 11 U.S.C. § 503 and shall give notice to secured creditors and the United States Trustee with opportunity for hearing.

This decision shall constitute the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. An order consistent with this decision will be entered.