**In re CENTURY INVESTMENT FUND VIII LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 88–05127.**

United States Bankruptcy Court, E.D. Wisconsin.

March 22, 1989.

Paul G. Swanson, Oshkosh, WI, for Century.

Andrew N. Herbach, Howard, Solochek & Weber, S.C., Milwaukee, WI, for First Bank.

## DECISION

M. DEE McGARITY, Bankruptcy Judge.

### PROCEDURE

This case comes before the court upon multiple motions by the holder of the first mortgage on the debtor's real estate, First Bank, N.A. ("First Bank"). Certain motions were disposed of orally in court on January 10, 1989 (the order erroneously states that the hearing was on January 9, 1989), and by written order dated February 1, 1989. Left to be determined are its motion to determine whether it has a perfected security interest in rents (cash collateral) and its motion to lift the automatic stay or for adequate protection. The cash collateral issues can be decided on briefs upon a stipulation of facts by the parties. If the court determines that it does have a perfected security interest in rents, then First Bank requests an accounting for rents, return of rents received, prohibition against future use of cash collateral and sanctions for use of cash collateral. An order concerning use of rents pending determination of the cash collateral issue was entered.

The preliminary hearing on the lift stay issue was held on December 16, 1988. The evidentiary hearing was held on January 5, 1989, and final arguments were held on January 10, 1989.

### FACTS

Century Investment Fund VIII Limited Partnership was formed in 1981 for the purpose of acquiring Alhambra Village Apartments, an 88 unit apartment complex in DePere, Wisconsin, a suburb of Green Bay. The complex was built between 1971 and 1974. The purchase price was $2.7 to $2.8 million. There are four buildings of 22 units each, with a total of 8 studios, 48 one bedroom units and 32 two bedroom units. Underground and above-ground parking are provided.

The sole general partner of the debtor is Century Capital Group, a general partnership originally consisting of Wayne C. Chaney and J. Peter Jungbacker as general partners. In 1987, Century Capital Group, Ltd., a corporation, was formed and became another general partner of Century Capital Group. Jungbacker and Chaney each own 50% of the stock of Century Capital Group, Ltd. There are eighteen limited partners.

Century Capital Group, Ltd. has three wholly owned subsidiaries. These include Century Capital Group Securities, Ltd., Century Capital Group Development, Ltd. and Century Management Group, Ltd. ("CMG"). CMG manages Alhambra Village and other real estate projects of which Century Capital Group is a general partner. Chaney and Jungbacker are unpaid officers and directors of CMG. CMG has a third director, John Helling, who is also its president.

The parties stipulated that on January 5, 1989, the following liens encumbered the property:

| First Bank, N.A. (first mortgage) | |
|---|---|
| Principal | $ 1,675,883.18 |
| Interest | 98,901.05 |
| Total | $ 1,774,784.23 |
| Per Diem | $ 628.45 |
| Limited Partners (second mortgage) | $ 400,000.00 |
| Delinquent Real Estate Taxes | $ 33,792.00 |

An appraisal prepared by David A. Peltin of Real Estate Appraisers, Inc. for First Bank states that the market value of the property is $1,965,000 and the "fair value" (liquidation value) is $1,775,000. The parties agreed that the debtor has no equity in the property.

Additional facts will be set forth in the appropriate parts of this decision.

## SECURITY INTEREST IN RENTS

The facts relating to First Bank's security interest in rents generated by Alhambra Village Apartments are undisputed.

On April 3, 1987, (effective as of April 1, 1987) the debtor executed a note and first mortgage on its real estate in consideration for a loan of $2,100,000 from First Bank. The mortgage stated:

> 14. Assignment of and Entitlement to Rents and Leases. As additional security for Obligations, Mortgagor does hereby assign, sell, transfer, demise and set over to Mortgagee all rents, issues, profits and leases now or hereafter due under or by virtue of any lease, whether written or verbal, or any letting of or agreement for the use or occupancy of any part of the Property. Upon default, which shall not be cured within the time permitted in the Note bearing even date herewith, Mortgagee may, at its sole option without any prior approval of Mortgagor, notify any or all tenants to pay directly to Mortgagee all rent, issues, and profits arising out of the property, and all payments required to be made pursuant to or by virtue of any lease agreement(s). Mortgagee may apply same, at its option and without regard to priority of application to payment of taxes, insurance premiums, operating expenses, reasonable attorney's and accountant's fees and expenses, and on the principal and interest of the indebtedness secured hereby, after deduction of a reasonable fee for services rendered in collection and management. This assignment shall continue until all Obligations secured by this Mortgagee have been fully paid and satisfied. The Mortgagee shall be entitled to all rent, issues, profits and leases pertaining to the Property immediately upon default by the Mortgagor in complying with any term or requirement of this Mortgage or any indebtedness or evidence of any indebtedness or guaranty secured by this Mortgage. It shall not be necessary for the Mortgagee to take any action for the Mortgagee to be entitled to all rent, issues, profits and leases.
>
> 15. Receiver. Upon the commencement or during the pendency of an action to foreclose this Mortgage or enforce any other remedies of Mortgagee, and without regard to the adequacy or inadequacy of the Property as security for the Obligations, whether or not waste is being committed or occurring, Mortgagee may seek and the court may appoint a receiver of the Property (including homestead interest) to serve without bond and take possession of the Property and collect its rents, issues and profits and all payments required to be made pursuant to or by virtue of any lease, to hold and apply the same as directed by the court, and to exercise such other powers as may be granted until the receivership shall cease.

Along with the mortgage, the debtor executed an "Assignment of Leases and Rents" as further security. That document is a present assignment of "[a]ny and all rights, interests or estates of the undersigned in, to and under any lease agreements which affect all or any part of the premises...." The assignment constituted First Bank as the debtor's attorney-in-fact to collect rents and to exercise various other powers to manage the property. How-

ever, the assignment was not to be exercised unless and until there was a default under the mortgage. Present and future lessors and tenants were authorized and instructed to pay rent to the mortgagee "upon receipt of demand from said mortgagee to so pay the same." Furthermore, any rights that the mortgagee has under the mortgage were not affected or impaired by the assignment.

After July 1, 1988, the debtor ceased making payments on the loan and was in default on the mortgage.

■ It is undisputed that the bankruptcy court must look to state law to determine rights of parties to property. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Village Properties, Ltd.*, 723 F.2d 441, 443 (5th Cir.1984) (*Butner* applies to code cases). Whether a security interest in rents is perfected is, therefore, a question of Wisconsin law. If First Bank's security interest in rents is unperfected, then the debtor has the right to use of those rents, and First Bank would have no right to adequate protection under 11 U.S.C. § 363(e). If First Bank's security interest is perfected, it has a right to protections available to it under state law. *In re Gotta*, 47 B.R. 198, 201 (Bankr.W.D.Wis. 1985).

Cases dealing with the right of a mortgagee to rents under Wisconsin law hold generally that the right does not arise unless the mortgagee takes possession of the rents, either by appointment of a receiver or by voluntary yielding of rents by the mortgagor. *See Wuorinen v. City Federal Savings & Loan Association*, 52 Wis.2d 722, 191 N.W.2d 27 (1971); *Dick & Reuteman Co. v. Jem Realty*, 225 Wis. 428, 274 N.W. 416 (1937); *Grether v. Nick*, 193 Wis. 503, 213 N.W. 304, 215 N.W. 571 (1927). Neither event occurred in this case. Alternatively, if the right of the mortgagee matures upon the happening of a specific event, clearly set out in the mortgage or assignment, then the happening of that event can constitute perfection of the mortgagee's interest. *Lincoln Crest Realty v. Standard Apt. Development*, 61 Wis.2d 4, 12 and 13, 211 N.W.2d 501 (1973) (lease

termination was the event). *See also In re Gotta*, 47 B.R. 198 (Bankr.W.D.Wis.1985). Therefore, this court must determine whether a discernible event provided for by the agreement occurred to give First Bank a present right to the rents.

The language of the debtor's mortgage speaks of the mortgagee's "entitlement" to rents after default. It authorizes payment by the tenants upon "demand from the mortgagee." The assignment of leases and rents also authorizes the mortgagee to demand rents directly from the tenants. Giving notice to tenants clearly would have constituted perfection, but the Bank did not do so. Consequently, the Bank must therefore look to some other act that would convert its "entitlement" to actual or constructive possession under the mortgage. The only other acts that could constitute perfection in this case are the letter written to the debtor by the Bank's officer on October 3, 1988, and the commencement of the foreclosure action in state court.

■ After the debtor defaulted on the mortgage, First Bank did not demand direct payment of rents by the debtor to the Bank. There was a letter from the Bank to the debtor dated October 3, 1988, which stated merely that the default interest rate would be charged and the account had been submitted to attorneys for collection. Rents were not mentioned, and the court cannot stretch the meaning of its words to find that the letter was a demand for payment of rents.

First Bank filed its foreclosure action in Brown County Circuit Court on October 19, 1988, and requested appointment of a receiver. The hearing on the appointment of the receiver was scheduled for November 18 or 19, 1988 (there are conflicting statements in the record), but the bankruptcy was filed on November 17, 1988, thereby staying further action.

As was stated earlier, Wisconsin adheres to the rule that possession or a discernible event giving right to possession under a contract is necessary for perfection of a

lienholder's interest in rents.[1] This is in contrast to other states that allow retroactive perfection back to the date of filing the foreclosure action or requesting appointment of a receiver. *See, e.g., In re Rief,* 83 B.R. 626 (Bankr.S.D.Iowa 1988) (security interest in rents can be perfected retroactively); *In re Village Properties, Ltd., supra* (commencement of action is sufficient if it appears the mortgagee under Texas law would have had a right to relief had the bankruptcy not intervened). However, one Wisconsin case interpreted a provision in the mortgage to hold that the *commencement* of a foreclosure action was the event giving rise to the right of possession. *First Wisconsin Trust Co. v. Adams,* 218 Wis. 406, 261 N.W. 16 (1935). The relevant clause in the mortgage, so far as it was quoted, was identical to the clause in paragraph 15 of the debtor's mortgage quoted above. *Id.* at 410–11, 261 N.W. 16. In that case, the complaint was accompanied by a restraining order regarding use of rents, whereas in this case, a motion for the appointment of a receiver was served. The difference is of no consequence because the *Adams* court focused on the commencement of the action as giving rise to the mortgagee's rights. The court found:

> The commencement of the action and request for a restraining order was the equivalent of a demand for rents, profits, and that the mortgagors give up possession. From that time on, the rights and liabilities of the mortgagors were limited by the provisions of the contract relating to default.

*Id.* at 411, 261 N.W. 16.

> So long as the mortgagors remained in possession they were entitled to collect rents, but they could not use them for their own benefit, and were accountable for all rents collected after foreclosure proceedings were commenced and demand for possession was made.

*Id.* at 412, 261 N.W. 16.

■ Thus, it follows that First Bank perfected its security interest in rents and other income when it filed its foreclosure action on October 19, 1988, and First Bank is entitled to an accounting of its interest from that date.

### AUTOMATIC STAY

■ First Bank moved to have the automatic stay, imposed under 11 U.S.C. § 362(a), lifted to allow it to continue its foreclosure on Alhambra Village Apartments. The Bank's security interest in the real estate is uncontested. Under 11 U.S.C. § 362(d), the court shall grant relief from the stay if there is cause, including lack of adequate protection. 11 U.S.C. § 362(d)(1). If the stay is not lifted for cause under 11 U.S.C. § 362(d)(1) or on other grounds under 11 U.S.C. § 362(d)(2), then First Bank is entitled to adequate protection. This court must then determine if the debtor's proposal for protection is adequate or what form such protection must take in order to be adequate.

■ Under 11 U.S.C. § 362(d)(2), the stay may be lifted if the debtor has no equity in the property, as is the case here when the $400,000 second mortgage to limited partners and real estate taxes are factored in, and the property is not necessary to an effective reorganization. The key statutory language in 11 U.S.C. § 362(d)(2) is that "the property is not necessary to an *effective* reorganization." (Emphasis added.) The debtor has the burden of proof as to this element. *United Savings Association of Texas v. Timbers of Inwood Forest, Ltd.,* 484 U.S. 365, 374, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) (*"Timbers"*); *In re National Real Estate Limited Partnership II,* 87 B.R. 986, 989 (Bankr.E.D.Wis. 1988). It is insufficient for the debtor to show merely that reorganization is impossible without the property. *Id.* That much is obvious to all concerned. The debtor must also show that reorganization is feasible within a reasonable period of time. *Id.* When effective reorganization is impossible, the purpose of Chapter 11 and the automatic stay cannot be fulfilled. Accordingly, the stay must be lifted. *In re National Real Estate Limited Partnership*

---

**1.** For an interesting discussion of the ancient history of the possession rule, *see In the Matter of Michigan Avenue National Bank,* 2 B.R. 171 (Bankr.N.D.Ill.1980).

*II, supra,* at 991–92; *In re 8th Street Village Limited Partnership,* 88 B.R. 853, 856–57 (Bankr.N.D.Ill.1988); *In re Anderson Oaks (Phase I) Limited Partnership,* 77 B.R. 108, 110–11 (Bankr. W.D.Tex.1987); *Matter of Anchorage Boat Sales, Inc.,* 4 B.R. 635, 641 (Bankr. E.D.N.Y.1980).

■ If it had been proved that reorganization of the debtor is impossible under any circumstances, then this court would not shrink from lifting the stay, even at this early stage of the proceedings. *See In re Park Avenue Partners Limited Partnership,* Case No. 88–02877 and *In re Century Investment Fund VII Limited Partnership,* Case No. 88–05127. However, the details of a possible plan need not be extensive when the hearing was held less than two months after filing (the Bankruptcy was filed on November 17, 1988). *See Timbers, supra,* 484 U.S. at 374, 108 S.Ct. at 632; *In re 6200 Ridge, Inc.,* 69 B.R. 837, 843 (Bankr.E.D.Pa.1987). Proof of impossibility must be compelling for this court to make such a determination as a matter of law, without allowing the debtor even to attempt to propose a plan. The court is not prepared to write this debtor off so quickly.

First, a plan of orderly liquidation is conceivable. The Bank's appraiser, David Peltin, testified that the property has a current market value of $1,965,000. The first mortgage and real estate taxes are about $1,808,800, for a difference of $156,200. This difference is covered by a $400,000 second mortgage to certain of the limited partners. However, Mr. Chaney testified that the limited partners may be willing to consent to foregoing part of their security interest and may be willing (although this is not likely) to make an additional loan to the limited partnership to take care of needed repairs. Mr. Peltin stated that the time needed to market the property is four to five months, which would not result in the Bank's lien accruing enough interest to exceed the value of the property.

When Mr. Peltin calculated the liquidation value of the property, he assumed the occupancy rate was 90% rather than its actual rate, 85%. Therefore, the liquidation value may be lower than his estimate. However, he stated that the apartments were large and attractive, some with fireplaces, and he felt that occupancy could reach optimum levels very quickly if new carpet were available. The 5% mistake is only four to five apartments, which this court does not view as terribly significant in light of the nature of the property. Mr. Peltin also felt that the surplus of apartments in the Green Bay area was diminishing, and this would help the occupancy rate. Mr. Chaney concurred, and he believed that rents could be raised in the near future. Mr. Chaney acknowledged that refinancing is probably impossible at this time; however, repair of the parking structure and replacement of unit carpeting, possibly coupled with a principal reduction of the first mortgage, may make the project eligible for affordable refinancing.

The debtor's outlook for reorganization while remaining in possession is more problematic. The per diem of $628.45 translates to interest of $18,853.50 for a 30 day month. The debtor provided an operating statement for the month of September, 1988, showing net operating income ("NOI") of $10,254.59. Adding back in the management fee would yield an NOI of $11,862.16. Year to date NOI plus management fees paid averaged $15,591.80 for 1988 through September. Using these figures, the debtor obviously does not produce sufficient income to cover interest on the debt.[2] Mr. Mulcahy, the corporate loan officer for First Bank, testified that the debtor's income would support a loan of $1,336,000, not the current debt level of $1,775,000. On the other hand, Mr. Peltin projected a potential average NOI of $17,750 using a reduction in current rents and no increase for the coming year. The debtor's projections were conservatively somewhat less, but they do show a positive cash

---

**2.** The debtor acknowledges that a plan calling for negative amortization may necessarily be proposed. By itself, this feature does not necessarily make a plan unconfirmable. *In re Spanish Lakes Associates,* 92 B.R. 875, 878 (Bankr. E.D.Mo.1988).

flow in approximately three years. That time may be shortened if improvements are made and rents are raised. Taking into consideration these various factors, this court is not convinced that the prospects of this debtor are so overwhelmingly bleak that the plug should be pulled at this time.

### ADEQUATE PROTECTION

This court is mindful of the fact that the debtor has the burden of proving that the creditor is adequately protected by its proposed offer of adequate protection. No offer was made with respect to rents because the debtor contested perfection. The debtor's evidence with respect to adequate protection of the creditor's interest in the real estate consisted of past income and projections of future income, but no actual offer was made. Normally, if an offer is inadequate, the court should either lift the stay or give the debtor an opportunity to raise the offer. *See In re McKillips*, 81 B.R. 454, 459 (Bankr.N.D.Ill.1987). However, due to the short term nature of this court's order, a finding of what will constitute adequate protection for the time being makes more sense. *Id.*

At the present time, the property is insured and is being maintained. Its value appears to be stable, although Mr. Peltin felt that it might decline without repairs. First Bank's lien is approximately 90% of the fair market value. The remaining value is subject to a $400,000 lien to limited partners who guaranteed a letter of credit to First Bank which was used to pay down the first mortgage to its present level. The limited partners holding the second mortgage have not requested adequate protection.

As was stated earlier, both the income and real estate are subject to the perfected security interest of First Bank. If First Bank were allowed to continue its foreclosure, it could have a receiver appointed to protect its interest in both. The receiver would collect the income and pay necessary expenses and apply any remaining income to the debt. This court will order the same for the present time. Although it would appear to be beneficial to both the debtor and the creditor to allow purchase of new carpet and parking lot repair from rents, it is the right of the secured creditor to make that decision.

The court's order attempts to balance competing factors in that the creditor's interest in the rents and other income is perfected, the debtor is able to pay currently only about half of the interest accruing on the note, and the equity cushion (10%) is only about half the value of a cushion that would be adequate by itself. *See* summary in *In re McKillips, supra,* at 458 (adequacy of the equity cushion alone is decided on a case by case basis, but 20% is generally considered adequate without additional cash payments).

First Bank is entitled to an accounting of rents between October 19, 1988 and November 17, 1988. Accountings filed with the court after filing of the bankruptcy should be sufficient to also account for rents. There will be no sanctions for the use of cash collateral after filing.

A separate order will be entered containing the terms of the temporary order outlined in the court's minutes of December 16, 1988, with the added condition that amounts remaining after payment of necessary expenses and agreed improvements will be paid to First Bank. Such amounts that have been accumulated by the debtor as of this date shall also be paid to First Bank, less a reserve of $15,000 for current expenses, which shall nevertheless also be subject to First Bank's perfected security interest.

The matter is adjourned to May 17, 1989, at 1:30 p.m., before this court to determine if the arrangement continues to constitute adequate protection, if the order should be modified, or if the stay should be lifted. By then the debtor should have more concrete plans concerning a plan, or an alternate plan may have been submitted.