**In the Matter of 8TH STREET VILLAGE LIMITED PARTNERSHIP, an Illinois limited partnership, Debtor.**

**Bankruptcy No. 87 B 12663.**

United States Bankruptcy Court, N.D. Illinois, E.D.

May 6, 1988.

Malcolm M. Gaynor, Richard M. Bendix, Jr., Schwartz Cooper Kolb & Gaynor, Chicago, Ill., for debtor.

Melanie R. Cohen, Jeff J. Marwil, Antonow & Fink, Chicago, Ill., for Beverly Hills Sav.

Michael D. McCormick, Timothy Kelly, Coffield Ungaretti Harris & Slavin, Chicago, Ill., for Lyons Sav. & Loan Assn.

## MEMORANDUM AND OPINION

ROBERT E. GINSBERG, Bankruptcy Judge.

### INTRODUCTION

This matter comes before the Court on the motion of Beverly Hills Savings, ("Beverly Hills" or the "Bank"), a Federal Savings and Loan Association and successor in interest to Beverly Hills Savings and Loan Association, a California Corporation, for relief from the automatic stay. The Court held a hearing on the motion and at the close of 8th Street Village Limited Partnership's, (the "debtor"), case, Beverly Hills moved for a judgment in its favor pursuant to Bankruptcy Rule 7041(b).[1] For the reasons set forth herein, the Court hereby grants Beverly Hills' Rule 7041 motion,

and orders that the automatic stay be lifted.

### FACTS

The facts in this matter are simple and most of them have been stipulated to.[2] The debtor is an Illinois limited partnership which owns and operates a shopping center, theater and office complex in downtown Boise, Idaho known as the 8th Street Marketplace, (the "Property"). The Property is managed by a local property management firm, Consolidated Property Management, Inc., which handles the day to day operations of the Property. Shell Properties/West, an affiliate of one of the debtor's general partners, provides additional supervisory management services such as marketing and lease negotiation.

On April 9, 1984 the debtor entered into a loan agreement with BH Mortgage, a subsidiary of Beverly Hills, for the sum of $8,415,000.[3] This loan was evidenced by a secured promissory note executed by the debtor in the amount of $8,415,000. Beverly Hills' security interest is properly perfected.[4] The Property failed to produce sufficient income to service the Beverly Hills' debt, and the debtor fell behind in its scheduled payments to the Bank.[5] On May

---

1. Bankruptcy Rule 7041(b), made applicable to contested matters by Bankruptcy Rule 9014, provides *inter alia*,

   [A]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief....

   As applied to this case, Beverly Hills was entitled to make such a motion because although the debtor was not the "plaintiff", *per se*, the debtor did carry the burden of proof. *See* discussion, *infra*, at 856.

2. One thing that is not stipulated to is the value of the property. The Bank contends that the property was worth approximately $7,150,000 at the time of the petition and offered an appraisal in evidence to support that view. The debtor's statement of facts filed with the Court before the trial states that "the Debtor's expert believes the Property may have been worth as little as $5,500,000 on the petition date, but believes further that there has been no decline in value since the petition date." The debtor produced

no expert at trial with respect to value of the Property and offered no appraisal evidence. In fact, the difference is irrelevant to the outcome of this motion as, under any analysis, the Bank is undersecured. In addition, as discussed *infra*, the debtor has no reasonable prospect of servicing the Bank's secured claim in the foreseeable future, be it $7,150,000 or $5,500,000.

3. Beverly Hills sold an eighty-five percent participation interest in the loan to Silverado Banking and Savings and Loan Association.

4. The promissory note was secured by, *inter alia*, a Deed of Trust, Assignment of Leases, Rents and Other Income which was recorded with the County Recorder of Ada County, Idaho. The title and interest in the loan documentation was subsequently assigned to Beverly Hills on December 29, 1986. The assignment was eventually recorded with the County Recorder of Ada County, Idaho on May 22, 1987.

5. The debtor claims, and Beverly Hills does not dispute, that the insufficient income was a result of distressed economic conditions in the Boise area.

20, 1987 the parties executed a loan modification agreement which was to be effective *nunc pro tunc* to October 1, 1986. In August of 1987 the debtor defaulted under the modified loan agreement because income from the Property continued to be insufficient to meet the payments due to Beverly Hills. On August 28, 1987, before Beverly Hills could institute foreclosure proceedings against the Property, the debtor filed its petition under Chapter 11 of the Bankruptcy Code, thereby automatically staying any collection efforts by the Bank.[6]

Beginning in September of 1987, Beverly Hills and the debtor agreed to a series of cash collateral orders entered by the Court which allowed the debtor to meet authorized operating expenses from the rents collected, which were part of the collateral securing the Bank's debt and which, of course, constitute cash collateral for purposes of 11 U.S.C. § 363. *See* 11 U.S.C. § 363(a). *Cf. In re Village Properties, Ltd.*, 723 F.2d 441 (5th Cir.), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *In re 666 Associates, Inc./Streeterville Utility Co., Inc.*, 65 B.R. 819 (N.D.Ill.1986); *In re EES Lambert Associates*, 62 B.R. 328 (Bankr.N.D.Ill.1986). Two of the orders specifically required that the debtor pay Beverly Hills all cash surplus exceeding the authorized operating expenses for the Property.[7] Beverly Hills has received $74,572.43 from the debtor as excess cash surplus. $25,334 of those payments went to pay the debtor's monthly, presumably real estate, taxes. Thus, from

the date of the petition through the end of February, a period of some six months, the debtor's net cash flow generated only $49,238 for payment to the Bank.[8]

The total debt owed to Beverly Hills as of the date the debtor filed its bankruptcy petition was $8,434,855.39.[9] Both the debtor and Beverly Hills agree that as of the date the debtor filed its petition, and as of April 20, 1988, the date of the automatic stay hearing, the debtor had no equity in the Property and Beverly Hills was undersecured and remains so. In addition, both sides agree that the Property is the debtor's sole asset and that the debtor will be unable to effectively reorganize if the stay is lifted.

## DISCUSSION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(G) as a matter relating to the automatic stay.

### 1. *11 U.S.C. § 362(d)*

Section 362(d) of the Bankruptcy Code provides two grounds under which relief from the automatic stay may be granted. The first ground is for cause, including lack of adequate protection. 11 U.S.C. § 362(d)(1). The second ground is that the debtor does not have any equity in the property and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). Beverly Hills has requested relief under both grounds.[10]

---

6. *See* 11 U.S.C. § 362(a).

7. These orders were dated October 13, 1987 and December 7, 1987.

8. By way of comparison, the modified prepetition loan agreement called for the debtor to pay Beverly Hills $71,411.32 *each month*.

9. This sum includes $7,623,130.87 of principal, $804,582.94 of accrued interest and $7,141.13 of late charges.

10. There is some dispute as to the value of the property securing Beverly Hills' loan and whether that value is being maintained. Beverly Hills claims that the value is declining, while the debtor claims, and presented evidence tending to show (not very strongly) that the value is

increasing. At this point in the proceeding, Beverly Hills presented no evidence as to its assertation of a decline in value. However, the Court is inclined to give little weight to the testimony on this point given by the debtor's supervisory manager as the witness was not an expert and the testimony is unsubstantiated. If the property is significantly declining in value the stay would likely have to be lifted under 11 U.S.C. § 362(d)(1) as the record is clear that the debtor would be unable to provide the Bank with adequate protection for at least the next three years against any significant decline in the value of the Bank's collateral. However, the Court need not address 11 U.S.C. § 362(d)(1) because the fact that the debtor has virtually no likelihood of being able to formulate an effective reorganization plan, as explained *infra*, entitles the Bank to relief under 11 U.S.C. § 362(d)(2).

### 2. Burden of Proof

The allocation of burdens of proof in actions seeking relief from the automatic stay is set forth in 11 U.S.C. § 362(g). This section provides that the moving party carries the burden of proof only as to the debtor's equity in the property. The party opposing the lifting of the stay, the debtor in this proceeding, carries the burden as to all other issues.[11] 11 U.S.C. § 362(g). *See Dallas v. S.A.G., Inc.*, 836 F.2d 1307, 1309 (11th Cir.1988); *In re Boomgarden*, 780 F.2d 657, 663 (7th Cir.1985). Because the issue as to the debtor's equity in the Property was stipulated to, the debtor carries the entire burden of proof in this proceeding.

### 3. Lack of Equity and Effective Reorganization—11 U.S.C. § 362(d)(2)

Section 362(d)(2) of the Bankruptcy Code applies only to a motion to lift the stay to pursue an action against property. Clearly the Bank wishes to pursue a foreclosure action against the shopping center, so that element is satisfied. In addition, for the stay to be lifted under 11 U.S.C. § 362(d)(2), the movant must establish that the debtor has no equity in the collateral it seeks to reach. *See* 11 U.S.C. § 362(g)(1). In light of the fact that the parties have stipulated to the fact that the Bank is undersecured, that element is satisfied as well.[12]

The final element of 11 U.S.C. § 362(d)(2) is that the property in question, here the Property, "[I]s not necessary to an effective reorganization". Here, the parties agree that the loss of the Property will make reorganization of this debtor absolutely impossible. However, this is not enough to prevent the lifting of the stay under 11 U.S.C. § 362(d)(2). Instead, it must be shown that loss of the property in question would prevent an *"effective reorganization"*. 11 U.S.C. § 362(d)(2) (emphasis added). As the following discussion shows, the word "effective" in this context means a realistic or feasible reorganization. *See, e.g., In re Albany Partners, Ltd.*, 749 F.2d 670, 673 n. 7 (11th Cir.1984); *In re Mikole Developers, Inc.*, 14 B.R. 524, 527 (Bankr.E.D.Pa.1981).

The United States Supreme Court has interpreted the phrase "effective reorganization" in 11 U.S.C. § 362(d)(2) to require:

> [N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the *en banc* court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time." [T]he cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. (Citations omitted). And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan ...

---

**11.** The debtor asserts that despite the allocation of the burden of proof to it in this proceeding, the ultimate burden of persuading this Court to lift the stay rests with the Bank, relying on *In re Planned Systems, Inc.*, 78 B.R. 852 (Bankr.S.D. Ohio 1987). Fortunately, the Court need not reach the issue of who has the burden of persuasion here. The Court's conclusion in this proceeding that the stay should be lifted here would be the same regardless of whether the burden lies with the Bank to persuade the Court to lift the stay or with the debtor to persuade the Court to have the stay remain in place. Regardless of who has the burden of persuasion, the evidence is clear; this debtor has no reasonable likelihood of being able to propose a confirmable plan of reorganization and has no equity in the Property. Therefore, the stay must be lifted. If the Bank has the burden of persuasion, it has satisfied that burden and persuaded the Court that the stay should be lifted from its analysis of the evidence adduced by the debtor.

**12.** In fact, there is another mortgage against the Property held by Lyons Savings and Loan Association. That mortgage is junior to the Beverly Hills mortgage and therefore is an entirely unsecured claim. *See In re Mason*, 70 B.R. 757, 758 (Bankr.W.D.N.Y.1987); *In re Lindsey*, 64 B.R. 19, 20–21 (Bankr.C.D.Ill.1986). The existence of the junior mortgage would be relevant in determining the existence of equity for purposes of 11 U.S.C. § 362(d)(2). *See In re Mellor*, 734 F.2d 1396, 1400–01 (9th Cir.1984). Thus, the Property is not only under water by virtue of the first mortgage, it is deeply submerged by virtue of the second mortgage.

even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* —— U.S. ——, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988) (emphasis in original). Accordingly, this Court must review the evidence presented by the debtor and determine whether an effective reorganization is within prospect.

The debtor filed a proposed plan of reorganization on the eve of the hearing on the motion to lift the stay. The gist of the debtor's proposed plan is that it will significantly reduce interest and principal payments to the Bank for three years while it implements a vague plan to increase its retail occupancy rate and the rental of its office space from its current dismal level to a more respectable level while it endeavors to compensate for the prospective loss of its major office space tenant, Idaho First National Bank, which rents a large portion of the office space and is about to vacate. After three years, the debtor projects that its turnaround plan will be successful and that it will be able to service the Beverly Hills debt on a current basis. From years three to eight, it will apparently turn the Property from the sow's ear it currently is into a silk purse. In year nine it will sell the shopping center for $10,095,300 to some as yet unknown buyer. It will use the proceeds to pay $6,720,000 to Beverly Hills. The rest of the proceeds will go to the debtor's other unsecured creditors and equity owners. Some or all of the equity owners will contribute limited amounts of interim working capital to the debtor to finance the turnaround. No payments are provided by the plan for Beverly Hills' deficiency claim, which according to the debtor's debt service projections should total some $2,880,000 by the time of the sale.

On its face, the debtor's proposed plan is not an "effective reorganization". Even without a confirmation hearing, it is patently clear that the proposed plan is not confirmable. In fact the plan filed on the eve of the stay hearing is little more than a desperate effort to avoid the lifting of the stay. When viewed in light of the debtor's own projections, the plan cannot satisfy the feasibility requirements of 11 U.S.C. § 1129(a)(11).

The purpose of the feasibility requirement is to prevent confirmation of a visionary scheme promising more than the debtor possibly can achieve. *In re Merrimack Valley Oil Co.,* 32 B.R. 485 (Bankr.D.Mass. 1983). Sincerity, honesty and willingness are not enough to make a plan feasible. *In re Clarkson,* 767 F.2d 417, 420 (8th Cir. 1985). The Court does not doubt that the debtor will use its best efforts to sell or refinance the property within nine years. However, the plan sets forth no concrete proposals as to purchasers or refinancing or alternatives if the sale/refinance does not come to fruition. In such circumstances, it would be virtually impossible for the Court to find that "the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor...." 11 U.S.C. § 1129(a)(11). *Cf. In re Spirited, Inc.,* 23 B.R. 1004 (Bankr.E.D.Pa. 1982).

If the debtor cannot sell or refinance the property, the plan (should it get that far) would be doomed and everybody, i.e., the debtor's unsecured creditors, its equity owners and the Bank, would take a bath. In such circumstances, liquidation or another financial reorganization is exactly what would be required. The unsecured creditors and the equity owners would be wiped out and the Bank would wind up with the property after nine years of waiting. This scenario is at least as likely as the sale or refinancing contemplated by the debtor's plan. In fact, the evidence adduced at the hearing indicates that the scenario appears more likely than the outcome projected by the debtor. Accordingly, the Court could not find the plan feasible. *See In re Wester,* 84 B.R. 770 (Bankr.N.D.Fla. April 4, 1988). The evidence presented by the debtor makes it clear that the debtor's plan is premised on little more than hopes and dreams.

The debtor relied almost entirely on the testimony of Mr. Server, the chief executive officer of its supervising manager, in

support of its contention that an effective reorganization is in prospect. As to feasibility, Mr. Server testified that the first major regional mall is now being built in Boise. Instead of viewing this as a problem for the debtor, Mr. Server, in an analysis that would make Lewis Carroll proud, concluded that the new mall would help the debtor by bringing national retailers to Boise who would succeed there and then seek additional outlets in Boise, turning, presumably, to the debtor's empty stores. The Court's common sense tells it that the construction of this new mall will not benefit the debtor. It is not going to increase the traffic in downtown Boise, and it is adding approximately 900,000 feet of retail space to be leased to national department store chains and other retail stores in direct competition with the debtor's retail tenants. Such competition will harm the debtor, not benefit it.

Mr. Server also testified that an office building, under construction near the Property, will result in increased patronage for the debtor's retail tenants. However, the rental of such office space is also in direct competition with the debtor's rental of its own office space. Although Mr. Server testified that the office space in the new building is "Class A" and that the debtor's office space is "Class B", the Court cannot discount that there will be competition between the two facilities and the debtor's efforts to recover from the loss of the bank tenant renting a major portion of its office space will suffer as a result.

Mr. Server also testified that a convention center is to be built quite near the Property and is expected to be opened in August of 1989. He concluded that this development will also have a positive effect on the debtor's prospects. It is clear that the construction of this convention center is speculative. Mr. Server testified that the construction has been planned and cancelled for some 22 years and that while the plans to build now appear to be final, construction has not yet begun. In addition, the plans for the convention center include the building of a skywalk between the center's parking structure and the center. This will certainly negate much of the anticipated benefit to the debtor from the convention center, if and when it is built, because convention center traffic will not be passing the debtor's shopping center at street level.[13]

Finally, Mr. Server testified that the Boise economy is no longer in a slump and that as a result of the turnaround in the local economy, Boise and the debtor should prosper. Mr. Server said his optimistic view regarding Boise was based on vague, unspecified conversations with various people in Boise and what he had read in the media. He cited no articles or studies. He seemed convinced by rumor and by his own desire for the debtor's problems to work out well. The Court found his testimony in regard to Boise entirely unconvincing. Mr. Server may have some general investment expertise. He has no expertise with respect to the economy of Boise or Idaho. Such expert testimony is clearly available from the faculties of institutions such as the University of Idaho or Boise State University. The failure of the debtor to introduce any expert testimony in this regard is telling.[14] In addition, because the debtor chose to file this case in Chicago where the partnership is located rather than Boise where the Property is located, this Court has no independent knowledge of the State or future of the Boise economy.[15]

13. The debtor was successful in negotiating a traffic light at ground level to make access to the Property easier. Nonetheless, common sense tells the Court that more people would rather take the skywalk than fight their way across traffic.

14. On an objective basis, the results in the Chapter 11 case to date do not bear out Mr. Server's allegations of a turnaround in the Boise economy. The debtor's 27% retail space vacancy rate, which is obviously in sharp contradiction to the 90% plus occupancy rate contemplated by the plan, has not been noticeably bettered by a 35%, across the board, temporary reduction in retail rents implemented by the debtor. Apparently the debtor cannot rent its vacant retail space even at bargain basement prices.

15. According to Mr. Server, the value of the dollar is increasing in Idaho and that such increase would help Boise and the debtor. Idaho

Unfortunately, the Court cannot give much weight to Mr. Server's testimony because the Court finds his testimony highly speculative. After reviewing the foregoing, it is hard to see anything on the horizon, nor is there anything in the record, which bodes well for the debtor's situation. The Court could not agree with Mr. Server's sanguine view of the debtor's future. Mr. Server struck the Court as a dreamer who can find a silver lining in every cloud and build a plan on hopes and dreams in lieu of realistic prospects.[16] Suffice it to say that the debtor's sorry history and the record of prospective increases in competition in the Boise area belie Mr. Server's optimism. Accordingly, the Court finds that the April 14, 1988 plan proposed by the debtor is not feasible.

The plan is also not confirmable because it apparently cannot meet the "fair and equitable" test under 11 U.S.C. § 1129(b)(1).[17] "[F]air and equitable means that, in a very literal sense, the plan must be 'fair' and the plan must be 'equitable'." *In re Cheatham,* 78 B.R. 104 (Bankr.E.D. N.C.1987). The burden is on the plan proponent (here the debtor) to prove that a plan is fair and equitable. *In re Stoffel,* 41 B.R. 390 (Bankr.D.Minn.1984). The plan proposed by the debtor, with the nine year repayment schedule and sale or refinancing

contingency, and, in three years of reduced payments of principal and interest to the Bank cannot possibly be considered "fair and equitable" in its treatment of Beverly Hills. *See In re Stoffel,* 41 B.R. 390, 392 (Bankr.D.Minn.1984).

Mr. Server's testimony made it clear that the plan was nothing more than a proposal by the debtor to speculate over the next nine years with the Bank's money. If the debtor's plan fails, Beverly Hills bears the loss. If it succeeds, the debtor's unsecured creditors and equity owners get the benefit. The Bank's claim is fixed by the plan at $6,720,000 with no provision for any deficiency claim. Therefore, it is hard to see what benefit the plan offers the Bank or how it is either fair or equitable to the Bank. This is particularly true in light of the fact that the plan proposes a significant partial moratorium on interest and principal payments to Beverly Hills for the first three years of its life. Again, it is hard to see how requiring the bank to largely give up its rights to *post confirmation* interest and principal payments for three years while the debtor sees if it can solve its current and projected serious occupancy problems is either fair or equitable to the Bank. *Contrast Timbers, supra,* dealing with *pre-confirmation* interest payments on undersecured debt.[18]

---

16. Another example of this was Mr. Server's view that the loss of a large portion of the debtor's parking space due to condemnation by Ada County to construct a new traffic pattern around the debtor's property would be beneficial. No studies were offered in support of that conclusion. It is unclear what effect the new traffic pattern will have. The Court will not guess. Alternative parking arrangements were speculative at best, although the construction of a public parking garage across the street from the Property for the projected convention center could help. However, Mr. Server again chose to look at the problem in the most optimistic way without the benefit of serious analysis.

may be one of the few places in the world where the value of the dollar is increasing. It is certainly not increasing in London, Paris or Tokyo. In fact it is likely that *decreases* in the value of the dollar would benefit the Boise economy by making the microchip manufactured there more competitive in international markets. Mr. Server's lack of understanding in this area did not help his credibility.

17. The Bank has announced that it will vote against the plan. At the hearing, the Court rejected the debtor's argument that a vote in the Bank's economic self interest would be in bad faith under § 1126(e) because it would wipe out the unsecured creditors and equity owners as frivolous. The Court hereby reaffirms that holding. Without the Bank's consent, the debtor has no choice but to resort to "cramdown". Thus, analysis under 11 U.S.C. § 1129(b) is required. *Cf. Norwest Bank Worthington v. Ahlers,* — U.S. —, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

18. It is also worth noting that the plan could not be crammed down on the Bank because it does not satisfy the absolute priority rule. The plan seems to assume that the Bank would have a deficiency claim of upwards of $2,880,000 which would be enough to allow it to control the unsecured creditor class. The plan does not provide for payment in full of the deficiency claim. Nevertheless it provides for participation by equity owners. On its face, participation by those equity owners making no new

Finally, the Court reviewed the debtor's financial projections, prepared in connection with the April 14, 1988 plan, with Mr. Server. The purpose behind such a review was an attempt to determine if the numbers could be juggled to suggest to the Court that another reasonable reorganization plan could be proposed in short order. This Court concludes that it could not. The debtor's numbers provided in its financial projections are speculative at best. They are premised on what will happen in nine years. The numbers are based on what *may happen* to the Boise economy. The debtor has presented no persuasive evidence as to these matters.

The Supreme Court has made it clear that after the first four months of a case there should be some showing of a realistic reorganization plan that is in prospect. *See Timbers* 108 S.Ct. at 632. This case is already eight months old, and after reviewing the evidence the Court concludes that there is no effective reorganization within sight here. In sum, neither the debtor's plan on file with this Court, the debtor's financial projections nor the debtor's testimony support the finding of the possibility of an effective reorganization. What those numbers lead the Court to conclude is that the debtor's plans are unrealistic and bottomed on little more than hopes and dreams. On any realistic analysis, the debtor cannot service the allowed secured claim of Beverly Hills at any reasonable market interest rate assuming, as both sides seem to agree, that such claim exceeds $6,000,000,[19] for at least three years. Debt service thereafter is premised on a projected turnaround in the debtor's occupancy rate, which nothing in the record supports. The debtor's plan is little more than a "visionary scheme for resuscitation".[20] It does not come close to being an "effective reorganization". Accordingly, the debtor has failed to sustain its burden in this regard.

## CONCLUSION

IT IS HEREBY ORDERED that Beverly Hills' motion for relief from the automatic stay is granted.

---

contribution violates absolute priority. *See* 11 U.S.C. § 1129(b); *Ahlers, supra.* As to those equity owners making contributions of new money, there is no indication as to what amounts of new capital are necessary. More importantly, there is no evidence that what the plan offers to the contributing partners in any way relates to what is being contributed. *See In re Potter Material Service, Inc.,* 781 F.2d 99 (7th Cir.1986). The record is also unclear as to what the effect of an election by the Bank under 11 U.S.C. § 1111(b) would be on the plan.

19. It is worth noting that the debtor introduced no evidence of the value of the property beyond the arbitrary $6,720,000 suggested in its plan as the current value of Beverly Hills' secured claim under 11 U.S.C. § 506(d). The debtor's finding of fact to the effect that the debtor's expert *would testify* as to a $5,500,000 value is meaningless as no such expert or testimony was produced. In any case, the debtor could not service $5,500,000 of secured debt, even at current market interest rates, within the reasonably foreseeable future.

20. *Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13 (1936).