In re PARK PLACE ASSOCIATES, an Illinois limited partnership, EIN # 36–3389544, Debtor.

Bankruptcy No. 89 B 12380.

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 21, 1989.

Gerald F. Munitz, Frank L. Butler, Richard R. Stanley, Winston & Strawn, Chicago, Ill., for Heller Financial.

Richard M. Bendix, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON HELLER FINANCIAL'S MOTION TO DISMISS

JACK B. SCHMETTERER, Bankruptcy Judge.

Trial was held on the Motion of Heller Financial, Inc. to Dismiss this case. Evidence was admitted and final argument heard. The Court now makes and enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. In March 1985, Abacus Mortgage Investment Company, the predecessor of Heller, loaned LaSalle National Bank as Trustee under trust number 109425, dated February 1, 1985 (the "Land Trust") the sum of $29,500,000 for the acquisition and construction of Orland Park Place (the "Mall"). (Exhibit C) The sole beneficiary of the Land Trust was and is Park Place Associates, the Debtor herein ("Debtor"). The Mall is a commercial shopping center located at the southeast corner of LaGrange Road and 151st Street, Orland Park, Cook County, Illinois.

2. Repayment of the loan was secured by a mortgage dated March 28, 1985, recorded with the Recorder of Deeds, Cook County, Illinois on March 29, 1985 as Document No. 27494306. (Exhibit B) As additional security, the Land Trust and Park Place Associates also executed an Assignment of Rents and Leases in favor of Heller, filed with the Recorder of Deeds, Cook County, Illinois as Document No. 27494307 (Exhibit Q) as well as a security agreement. (Exhibit N)

3. William Spatz ("Spatz"), general partner of Debtor, executed an Equity Note secured by the mortgage, security agreement and financing statement. (Exhibit J)

4. The Debtor and Heller also executed a Building Loan Agreement (Exhibit K), an Amendment to Building Loan Agreement (Exhibit L) and a Second Amendment to Building Loan Agreement. (Exhibit M)

5. Subsequently, the Note and Mortgage were modified by the following: Loan Modification Agreement dated December 30, 1985 (Exhibit D); the Second Loan Modification Agreement dated July 31, 1986 (Exhibit E); the Amended and Restated Promissory Note for $33,950,000 dated July 31, 1986 (Exhibit F); the Amendment to Mortgage, Security Agreement and Financing Statement dated March 29, 1987 (Exhibit G); the Third Loan Modification dated March 29, 1987 (Exhibit H) and the Second Amended and Restated Promissory Note for $41,550,000 dated March 29, 1987. (Exhibit I) Each of the foregoing documents was recorded with the Recorder of Deeds, Cook County, Illinois, on January 7, 1986; August 4, 1986; August 17, 1987 and August 21, 1987; as Document Nos. 86006143, 86332289, 87455264, and 87463521, respectively.

6. The Land Trust defaulted under the loan documents by failing to pay the amounts due under those documents on June 30, 1988 and payments accruing thereafter.

7. The Land Trust also defaulted under the loan documents by failing to keep the premises free from liens not expressly subordinate to Heller's loan, and by failure to make real estate tax payments.

8. Debtor filed its Petition for Relief herein under Chapter 11 of the Bankruptcy Code on July 26, 1989. On that date, the amount due and owing to Heller under the second amended and restated note was $46,066,702.22. On the equity note a total of $415,493.76 was due as of July 26, 1989. (Exhibits P and P–1)

9. According to the Schedules filed herein by Park Place on September 1, 1989, the Village of Orland Park claims liens, senior to Heller's alleged mortgage lien, on certain portions of the Mall securing an alleged debt aggregating approximately $182,000; eight other entities have asserted mechanics liens against the real estate constituting the Mall. According to the Schedules, the alleged secured claims of the Village of Orland Park and mechanics lien claimants aggregate $845,297.86. Park Place's Schedules also list 88 unsecured creditors claiming an aggregate of $222,-808.83.

10. The Mall constitutes the Debtor's only material asset. (Exhibit DD, p. 31)

11. The Debtor employs full time only two individuals other than the principals. (Exhibit T, pages 15–16) Other part-time persons are employed by the Mall's manager Spatz & Company.

12. The Mall's income is insufficient to meet all necessary operating expenses, real estate taxes, and Heller's debt service.

13. Despite representations from Spatz at the preliminary hearing on this Motion that his father would likely provide guarantees or funding for the Mall, (Exhibit DD, pp. 26–27), his father has not agreed to support the Mall financially. No other source of cash infusion is available or offered from Debtor, Debtor's partners, Spatz & Company, or any other source.

14. On February 14, 1989, Heller filed a Complaint to Foreclose and for other relief ("Foreclosure Complaint") against, *inter alia,* the Land Trustee, the Debtor and William Spatz, individually, as guarantor, and as general partner of the Debtor in the circuit Court of Cook County, Illinois, County Department, Chancery Division. The Debtor filed its Answer and affirmative defenses on June 23, 1989 ("June Answer"). On July 12, 1989, Heller filed an Emergency Motion for Order Placing Mortgagee in Possession ("Emergency Motion") to allow Heller to collect all earnings, revenues and rents derived from the premises.

15. The Debtor's Chapter 11 Petition was filed shortly after the Emergency Motion to place the Mortgagee in Possession was filed by Heller in its foreclosure action. Two weeks after Heller filed its Emergency Motion, the foreclosure was stayed on July 16, 1989 by reason of the commence-

ment of this Chapter 11 cases and the invocation of the automatic stay.

16. The Chapter 11 petition was signed by "Eugene M. Faigus, Vice President of Heartthrob of Orland Park, Inc., General Partner of Park Place Associates." Mr. Spatz testified that he ceased acting as Debtor's general partner in January, 1989. He is, however, the president of the new general partner (Heartthrob of Orland Park, Inc.) and continues as president of Spatz and Company which has served as management agent for the Mall. (Exhibit CC, pp. 78–79)

17. (a) On August 11, 1989, Debtor filed a complaint in the District Court ("Lender Liability Complaint") asserting federal jurisdiction under 28 U.S.C. § 1334(b) by way of relation to this Chapter 11 case. Dismissal of Debtor's Chapter 11 case would deprive the District Court of jurisdiction over the Complaint before it. That suit is pending. The Lender Liability Complaint alleges various acts of purported misconduct by Heller constituting bad faith and breach by Heller of its obligation of good faith and fair dealing towards Park Place. In that Complaint, Park Place seeks various forms of relief against Heller including actual damages, punitive damages, a declaration that Park Place is not indebted to Heller in any amount, a declaration that Heller's alleged mortgage is of no force and effect with respect to the Mall, and subordination of Heller's claim against Park Place to the claims and interests of Park Place's other creditors and partners, respectively. Heller filed an answer denying the material allegations of the Lender Liability Complaint.

(b) On August 15, 1989, Park Place removed Heller's foreclosure action to the District Court, which referred it to this Court. Park Place has moved that the reference of the said foreclosure case be withdrawn and that said case be tried before the same judge presiding over the Lender Liability Complaint. Heller has moved that the said foreclosure action be remanded to state court. Those motions are pending.

18. The Debtor has no source of operating income other than the Mall rents.

19. For the months immediately preceding the filing of this Chapter 11 case, the average monthly revenue generated by the Mall was approximately $115,000. (Exhibit T, page 29)

20. In the various monthly cash collateral budgets filed by the Debtor, monthly operating expenses are approximately $100,000.

21. Those budgets do not provide for sinking funds, escrows, deposits, or any other payments being made by the Debtor to cover the approximately $85,625.55 that represents 1/12 of the last ascertainable yearly real estate taxes. Further, real estate taxes on the Mall in the approximate amount of $655,427.26 came due post-petition in August, 1989, but remain unpaid. Every 30 days about $9,831.41 in interest comes due on that installment. Future tax installments of at least $655,000 are likely to come due twice each year into the foreseeable future. Debtor has no funds or source of funding to pay those real estate taxes on the installment that came due post-petition. The cash flow of the Mall is clearly not adequate to pay anything toward such obligations. Debtor argues that Heller should advance those funds.

22. The non-payment of real estate taxes has permitted a large senior lien against Heller's real property collateral to accrue after the filing of the Chapter 11 case. The inevitable accrual of future liens for unpaid real estate taxes and interest thereon will further erode Heller's collateral value at the rate of about $1,310,000 in tax principal each year, plus $120,000 in interest per annum on each unpaid installment.

23. The Mall itself is being only marginally maintained. The fire pumps are no longer inspected on a weekly basis. (Exhibit BB, pp. 13–14) In recent months, full-time maintenance staff has been reduced to one employee, (Exhibit BB, pp. 18–19), plus part-time employees. Security has been reduced from three guards to two. (Exhibit BB, p. 16)

24. The testimony of Spatz, as president of the management agent, did not demonstrate a good working knowledge of the condition of the Mall or the number and

identity of staff assigned to and employed at the Mall to operate it.

25. Spatz owned a controlling interest in four tenants who, through Spatz & Co., leased 48,000 square feet in the Mall. All of those four tenants left owing back rent to the Mall in June 1989, the month before the Chapter 11 petition was filed in this case. (Exhibit CC, pp. 71–72 and Exhibit EE, pp. 40–45)

26. At the time of the filing of this Chapter 11 case, the Mall was only 46% occupied. (Exhibit BB, pp. 28–29) By the time of final hearing on Heller's Motion to Dismiss, the Mall was less than 41% occupied. While Debtor and its management have made efforts to obtain other tenants, such efforts have been spotty and inadequate both in scope and execution and have clearly been unsuccessful. No operating business plan exists to change its dismal picture.

27. Between the time of filing the Chapter 11 case and commencement of the preliminary hearing on the instant Motion, the following tenants left the Mall: Frank's Jewelry, Tie Knot and This N' That. These tenants also owed rent. (Exhibit BB, pg. 26 and Exhibit DD, p. 5)

28. Since the commencement of the preliminary hearing on September 6, 1989 another tenant, Dress to the Nines, has left and part of Organization Plus has closed. (Bormes testimony)

29. In order to rehabilitate the Mall, the Debtor needs *bona fide* paying tenants.

30. The Mall has had a history of leasing to questionable tenants that were owned or controlled by Spatz, and were delinquent in paying rent and were placed in possession in order to increase the occupancy rate.

31. Values Unlimited is one of the tenants referred to in Finding No. 32. Spatz and the Debtor had a contractual obligation to Federated Department Stores to buy one of the Mall buildings from Federated if they could not obtain a certain occupancy rate at the Mall. To temporarily achieve that level, the Debtor spent almost $400,-000 to construct tenant improvements in the Mall for Values Unlimited. This money was spent at a time when Debtor was in default on Heller's loan. Values Unlimited conducted sales of salvage merchandise over a two to three-week period in time to meet a cure date under the contract of Debtor and Spatz with Federated Department Stores, then left. Debtor did not require Values Unlimited to enter into a long term lease before it spent the $400,000 to improve space to be occupied by Values Unlimited. Clearly, this "tenant" was a device to assist Spatz and Debtor to avoid liability after Federated demanded that they buy the property. (Exhibit CC, pp. 68–71)

32. There has been a high delinquency rate in the collection of tenant rental payments. Among those not paying rent have been the companies in which Spatz maintained a personal investment interest.

33. Spatz did not demonstrate substantial progress or planning for a Plitt movie theater or a family entertainment center as serious possible tenants. Heller raised questions about these proposed tenants, and pointed out that anchor tenants had to approve these tenants. Spatz did not answer the questions and neither sought nor obtained the required approvals. (Exhibit CC, pp. 63–65; 67–68)

34. There is not now and has been no recent or current viable marketing effort to obtain new *bona fide* tenants to fill vacant space at the Mall. (Exhibit EE, pp. 19–20) At the preliminary hearing on the Motion, Spatz suggested that he could attract tenants by offering free rent, among other devices. (Exhibit EE, p. 78)

35. The Mall is located across the street from a successful and active competitor mall, and there are many strip shopping centers within the nearby area which are highly competitive with the Mall. (Exhibit Z, pp. 36–37)

36. In order to obtain *bona fide* tenants, the Debtor will have to spend several millions of dollars to build out Mall space that was never completed, make improvements for new tenants in existing space and pay leasing and brokerage expenses and commissions. (Exhibit BB, p. 34) It will likely take up to three years to complete the Mall improvements and obtain

paying tenants. (Exhibit BB, p. 35 and Exhibit Z, p. 33)

37. Yearly payments due on Heller's debt are at least $4,600,000. (Exhibit BB, p. 36) With an inadequate monthly cash flow, and considering unpaid real estate taxes and necessary operating expenses, the Debtor cannot possibly pay for the needed improvements and taxes, let alone pay anything on Heller's debt.

38. The value of the Mall is substantially less than the amount of Debtor's indebtedness to Heller. (Exhibit O)

39. The two proposed transactions for the Mall put in evidence by Debtor do not reflect the current fair market value of the Mall. Both proposed transactions were in preliminary stages and were subject to several contingencies and requirements some of which were not met.

40. The January, 1989 purported Agreement of Sale to Prime Property Partners, Inc. (Debtor's Exhibit 5) was not strong evidence of the fair market value of the Mall. That Agreement required a Master Lease Agreement of all vacant space and outlets for 36 months at an unspecified amount of rent to be fully secured by an irrevocable Letter of Credit issued by a lending institution acceptable to purchaser. The amount of this undertaking was calculated to exceed $10 million. The Debtor admitted that it could not supply the required security, but wanted Heller to supply it. Heller was under no duty to do so. (Testimony of David Bormes)

41. Debtor's Exhibit 5, which purports to be a draft Agreement of Sale with Prime Property Partners, Inc., contained blank spaces where entries appear to have been whited out. Although requested by this Court to do so, Debtor has never produced the original of Exhibit 5.

42. The Dacourt Group, Inc. proposal required Heller to lease all unoccupied space at an unstated pro forma rent plus expenses for five years. (Debtor's Exhibit 2) The amount of this undertaking was never determined by Debtor, but was admitted to be substantial. Heller was under no duty to agree to such a proposal.

43. The Dacourt proposal required William Spatz to guarantee the loan personally for a ten-year term, and provided that a satisfactory review of his financial position was a condition precedent to closing. (Debtor's Exhibit 2) Spatz never disclosed to Dacourt that he was at that time in alleged default of his guarantee of an unrelated $3.9 million obligation; (Exhibit EE, p. 76) nor did Mr. Spatz disclose to Dacourt the magnitude of his interest in several mall tenants. (Exhibit EE, p. 78–79)

44. Since the filing of this Chapter 11 case, $655,427.26 in real estate taxes has come due with some $9,831.41 in interest coming due every thirty days since August 7, 1989. These amounts constitute administrative expenses of the estate. Similar or greater installments will come due twice a year in the foreseeable future, and similar interest will accrue on each unpaid installment. The Debtor has no resources to pay these expenses now or in the foreseeable future unless it recovers from Heller in the pending litigation.

45. The current value of the Mall is in the range of $28,000,000 to $30,000,000 (Exhibit O). Heller's claim as of July 26, 1989 is $46,066,702.22, (Exhibit P). Heller therefore has an unsecured claim of at least $16,000,000. That unsecured claim constitutes more than two-thirds of all unsecured creditors. Heller's expressed intent is that it does not intend to vote in favor of any plan in which Spatz continues to operate the Mall or which does not provide for a substantial cash infusion. (Bormes testimony)

46. Debtor filed its Plan of Reorganization herein prior to the final hearing. Debtor contends that it may be able to fund its Plan if it succeeds in its lender liability suit. That suit, before the District Court, which is to be tried before a jury, could conceivably last many years before it reaches a conclusion. A decision in that case in favor of the Debtor is highly speculative. No evidence was offered to show that Debtor has a strong or even *prima facie* case in that suit. The only evidence with respect thereto showed merely that the suit was filed and is pending. In the meantime, under Debtor's proposed Plan, Heller and Debtor's other creditors must

wait many years before they receive any payments. Debtor's proposed Plan is to sell the Mall under court supervision and then pay off all creditors from sale proceeds in order of their security and priority after the Plan's "effective date." However, the "effective date" is defined as the date all contested liens on the Mall are resolved, that is many years hence after the Heller litigation is completed and all appeals ended.

47. No evidence was offered as to how long the issues would pend before trial in the District Court as compared to the time to await trial in the Circuit Court of Cook County.

48. Following preliminary hearing held on Heller's Motion to Modify Stay and the instant motion, this court entered an order on September 28, 1989 modifying the automatic stay to permit Heller to proceed on its foreclosure action. Since the evidentiary hearing on motion to dismiss concluded, Debtor has voluntarily surrendered possession of the Mall to Heller and a new manager is now in control.

49. The Findings of Fact announced by the Court from the bench on September 12, 1989, following hearing on motion to modify stay, the further remarks of the Court at the conclusion of hearing on motion to dismiss, and any fact findings contained in the Conclusions of Law, will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter hereof pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a).

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3. The Court may dismiss a Chapter 11 case for cause, including (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, or (2) inability to effectuate a plan. 11 U.S.C. § 1112(b).

4. Statutory criteria for dismissing a Chapter 11 proceeding are set forth under § 1112 of the Code. It is well established that the enumerated causes set forth in § 1112 are not exclusive. Although bad faith is not one of the ten grounds for dismissal promulgated in 11 U.S.C. § 1112(b), circuit courts have recognized and affirmed the power of bankruptcy courts to dismiss Chapter 11 cases that fail to meet a good faith standard. *See, e.g., In re Madison Hotel,* 749 F.2d 410, 426 (7th Cir.1984) (dicta); *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987); *In re Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986). The concept of good faith as a prerequisite for filing a Chapter 11 case was discussed in *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir.1985), which stated:

> Factors relevant in examining whether a Chapter 11 petition has been filed in good faith include whether the debtor has any assets, whether the debtor had an ongoing business to reorganize, and whether there was a reasonable probability of a plan being proposed and confirmed.

In ruling on a motion to dismiss a case for lack of good faith, the Court must be mindful of, and attempt to preserve, the delicate balance of interests fashioned by Congress under Chapter 11 of the Bankruptcy Code. *See, e.g., In re Johns–Manville Corp.,* 36 B.R. 727, 735–37 (Bankr.S.D.N.Y.1984).

5. In *In re Schlangen,* 91 B.R. 834, 837 (Bankr.N.D.Ill.1988), the Court stated that Chapter 11 was designed by Congress to prevent waste and reduction in assets that result from unnecessary liquidation. Congress meant to encourage financial restructuring and to re-establish efficient business operations with the goals of permitting greater payments to creditors then could otherwise be made, while also preserving jobs and shareholders interest. *See, e.g., In re HBA East, Inc.,* 87 B.R. 248, 259 (Bankr.E.D.N.Y.1988), *citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 220–21 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News pp. 5787, 5963, 6179. The good faith standard is the bankruptcy court's equitable mechanism for assuring that a Chapter 11 case has least the potential to serve those purposes. *Schlangen,* 91 B.R. at 837.

6. Good Faith or the lack thereof is determined by objective standards and not the subjective intent of the debtor. *Id.*

*See generally In re Mandalay Shores Co-operative Housing Association, Inc.*, 63 B.R. 842 (Dist.N.D.Ill.1986).

■ 7. The objective standards to be considered in determining whether filing was in bad faith have been set forth in many decisions. *See, e.g., Little Creek,* 779 F.2d at 1072–73:

> Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. Property has usually been posted for foreclosure because of arrearage on the debt and the debtor has been unsuccessful in defending actions against its foreclosure in state court. Alteratively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

8. Judge Barliant of this Court has followed the preceding guidelines and in *Schlangen* added another test: whether the Chapter 11 case was being used as a litigation tactic in essentially a two-party dispute, where the primary purpose for filing the bankruptcy was to confer federal jurisdiction on what otherwise would be a two-party dispute involving issues of state law, and where there was no possibility of rehabilitation of debtor's business. *Schlangen,* 91 B.R. at 837.

9. A number of the *Little Creek* and *Schlangen* criteria are applicable here:

### The Objective Tests

1) The debtor has one asset.
2) Liens encumber the tract.

3) Debtor has few employees.

4) Little or no cash flow.

5) No other source of income with which to support plan or provide adequate protection.

6) Pending foreclosure action.

### The Facts of this Case

1) The Mall is the Debtor's only asset.
2) Heller has a duly recorded mortgage and assignment of rents. Second installment of 1988 real estate taxes of $655,427.26 has not been paid and 1989 taxes accrue at the rate of $86,000 a month. There are also mechanics' lien claims of $663,297.77.

3) The Debtor. employs few full-time employees.

4) Budget is inadequate to meet taxes and Heller's debt service, let alone provide for improvements and buildouts necessary to attract new tenants.

5) Cash infusion has not been made and is not foreseeable. The business plan and proposed reorganization depend entirely on the uncertain prospect of ultimate victory over Heller in the lender-liability litigation.

6) Defaults occurred in 1988. Foreclosure commenced February 14, 1989.

Despite the presence of other creditors in this case, the lack of a successful plan prospect dooms this bankruptcy case in the face of mounting tax liens on the Debtor's key asset that secures the Heller loan. The facts of this case are similar to those condemned as involving bad faith in *Little Creek.* But the discussion in *Schlangen* is even more compelling:

> Without at the least the means and desire to reorganize, a debtor may not invoke a federal bankruptcy jurisdiction to litigate state court matters.

91 B.R. at 839.

Park Place is presently using bankruptcy as a vehicle with which to litigate for many years in federal court its lender liability claims brought under state law without demonstrating any realistic possibility of rehabilitation. In the meantime, its operation of the Mall is in a shambles and the Mall management has been surrendered to Heller. Debtor has not even shown this court that it can establish a *prima facie* case let alone a strong showing in its suit against Heller, the essential element in its Plan for ultimate reorganization.

10. The Court cannot confirm any plan proposed by Park Place if, *inter alia*, that plan does not provide for payment in full of allowed claims of the kind specified in 11 U.S.C. § 507(a)(1) on the effective date of that plan. 11 U.S.C. § 1129(a)(9)(A). There is no possibility that Debtor could pay large real estate taxes that have accrued as administrative expenses since the bankruptcy case was filed or those additional taxes to accrue in the future while Debtor litigates against Heller.

11. The Court cannot confirm any plan proposed by Park Place under 11 U.S.C. § 1129(a) if Heller is impaired by and rejects that plan as it intends to do so. 11 U.S.C. § 1129(a)(8), unless § 1129(b)(2) is applicable.

12. Even if the pending filed plan or any other that may be proposed by Park Place satisfies all of the applicable requirements of 11 U.S.C. § 1129(a), the Court cannot confirm that plan under 11 U.S.C. § 1129(b) unless that plan does not discriminate unfairly and is fair and equitable with respect to each impaired rejecting class of claims. 11 U.S.C. § 1129(b). *In re 8th Street Village Ltd. Partnership*, 88 B.R. 853, 859 (Bankr.N.D.Ill.), *aff'd*, 94 B.R. 993 (N.D.Ill.1988). In this regard, a secured creditor must receive under a plan deferred cash payments equal to the value of the creditors secured interest "as of the effective date of the plan." 11 U.S.C. § 1129(b)(2)(A)(i)(II). By deferring the Plan's effective date far into the distant indefinite future after Heller's secured interest will have sharply dissipated due to accrual of large unpaid real estate taxes, Debtor seeks to pervert the purpose of the law which is to fix rights of the parties at or shortly after confirmation. Debtor offers no protection for Heller's present security value should Debtor lose its suit against Heller. The proposed Plan does discriminate unfairly against Heller in favor of junior creditors who stand to gain if the lender liability suit is successful, while Heller loses its equity position if it wins that suit. The proposed Plan is not fair and equitable as to it.

13. Cause exists for dismissing the Chapter 11 case filed herein. The case was filed in bad faith. The Debtor cannot rehabilitate in any business sense, and has not shown any meaningful possibility of rehabilitating in a financial sense. Efficient business operations by it are wholly improbable. It has not demonstrated any possible Plan or any chance of success in the lender litigation that would offer hope of greater payments to other creditors. The mere filing by it of the lender liability suit does not provide a basis for this case. Accordingly this bankruptcy case should be dismissed.

Wherefore, by separate order to be supplied, this case will be dismissed. The parties are invited to submit thereafter appropriate motions for either dismissal or remand of the pending mortgage foreclosure case.